Filed 6/12/13 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DIANE JENKINS, | |
| Plaintiff and Appellant, | G046121 |
| v. | (Super. Ct. No. 30-2011-00438159) |
| JP MORGAN CHASE BANK, N.A. et al., | ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT. |
| Defendants and Respondents. | |

On the court's own motion, we modify the opinion by deleting the sentence on page 10, stating, "Additionally, the debtor has the right to postpone the foreclosure sale for one day to pay off the outstanding debt.  (*Whitman v. Transtate Title Co.* (1985) 165 Cal.App.3d 312, 317-320.)"

O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


THOMPSON, J.

Filed 5/17/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DIANE JENKINS,<br><br>    Plaintiff and Appellant,<br><br>       v.<br><br>JP MORGAN CHASE BANK, N.A. et al.,<br><br>    Defendants and Respondents. | G046121<br><br>(Super. Ct. No. 30-2011-00438159)<br><br>O P I N I O N |

         Appeal from a judgment of the Superior Court of Orange County, William M. Monroe, Judge.  Affirmed.

         Law Offices of Patricia Rodriguez and Patricia Rodriguez for Plaintiff and Appellant.

         Bryan Cave, Stuart W. Price, Sean D. Muntz and Brett N. Taylor for Defendants and Respondent JP Morgan Chase Bank N.A. and Bank of America N.A.

         McCarthy & Holthus, Matthew Podmenik and Melissa Robbins Coutts for Defendant and Respondent Quality Loan Service Corporation.

Diane Jenkins (Jenkins) requests the reversal of the trial court's dismissal of her lawsuit after it sustained the two separate demurrers of (1) JPMorgan Chase Bank N.A. (Chase) and Bank of America, N.A. (B of A) and (2) Quality Loan Service Corporation (Quality). (These entities will collectively be referred to as Defendants, unless the context indicates otherwise.) In 2007, Jenkins executed a promissory note and deed of trust in order to refinance her condominium. After she failed to obtain refinancing for the same loan in 2008 and 2009, she defaulted on the loan and thereafter brought suit to avoid nonjudicial foreclosure and collect monetary damages.

Jenkins voluntarily amended her initial complaint, which she filed in propria persona, after she retained counsel. The court sustained Defendants' demurrers to Jenkins's first amended complaint (FAC) with leave to amend four of her five causes of action. Jenkins's second amended complaint (SAC) raised five causes of action. Two of the causes of action relate to her overarching assertion the secured interest created by her execution of the deed of trust in 2007 was extinguished by purportedly improper actions taken by Defendants and, consequently, Defendants should be prevented from foreclosing on her home. The other three causes of action relate to her allegations Defendants violated numerous state and federal laws with regard to the origination and servicing of her loan and the initiation of nonjudicial foreclosure. The court, finding Jenkins's SAC failed to allege a valid cause of action, sustained Defendants' demurrers without leave to amend. None of Jenkins's contentions have merit and we affirm the judgment.

FACTS

In March 2007, Jenkins obtained an adjustable rate loan in the amount of $375,500 from Washington Mutual Bank, F.A. (WaMu). She executed a promissory note for this amount. The loan was secured by a deed of trust, which encumbered her residence located in Laguna Niguel, California. The deed of trust identified WaMu as the beneficiary and California Reconveyance Company as the trustee. In January 2008, Jenkins requested WaMu refinance the loan. She alleges Chris Rogella, a WaMu loan

2

officer, gave her "the run around" for nearly two years and failed to assist her with refinancing her loan.

Meanwhile, in September 2008, WaMu financially collapsed and the United States Office of Thrift Supervision (OTS) seized the defunct bank and placed it into the receivership of the Federal Deposit Insurance Corporation (FDIC). FDIC succeeded to "all rights, titles, powers, and privileges" of the bank. (12 U.S.C. § 1821(d)(2)(A)(i).) Soon thereafter, FDIC, by way of a purchase and assumption agreement executed on September 25, 2008, transferred certain assets and liabilities of WaMu, including the defunct bank's loan portfolio, to Chase. Under the terms of the purchase and assumption agreement, Chase did not assume any liability for WaMu's lending or loan purchasing activities prior to September 25, 2008.

Jenkins alleges Rogella advised her, sometime after September 2009, to cease making payments on her loan to qualify for a loan modification and to obtain a more favorable interest rate. Subsequently, Jenkins defaulted on her loan, and on April 30, 2010, Quality recorded a notice of default. At this point in time, Jenkins was more than $9,199 in arrears. Her extensive efforts to negotiate a reduction of her loan payments were unsuccessful.

On June 11, 2010, Chase, acting as the "present Beneficiary" of the deed of trust, recorded a substitution of trustee designating Quality as trustee. Two months later, Quality recorded a notice of trustee's sale, seeking the unpaid balance of $392,314.77. The foreclosure sale was subsequently postponed and has not been rescheduled.

On January 5, 2011, Jenkins, acting in propria persona, filed her initial complaint against Chase, WaMu, and Quality. Chase, on behalf of itself and as the acquirer of WaMu, responded by filing a demurrer. Before the matter could be heard, Jenkins hired an attorney and filed her FAC on April 20, 2011. The FAC alleged five causes of action: (1) lack of standing to foreclose; (2) unfair business practices in violation of Business and Professions Code section 17200 et seq., and Penal Code section

3

115.5 [fraudulently procured documents] (hereafter unfair business practices); (3) contractual breach of good faith and fair dealing; (4) violation of the Truth in Lending Act, 15 U.S.C. section 16.01 et seq. (TILA); and (5) violations of the Real Estate Settlement and Procedures Act, 12 U.S.C. section 2601 et seq. (RESPA).

The crux of Jenkins's lawsuit is based on her theory her loan was pooled with other home loans in a securitized investment trust, which is purportedly now managed by B of A, as the acting trustee, without proper compliance with the investment trust's pooling and servicing agreement. Her FAC alleged the failure to comply with the pooling and servicing agreement extinguished the security interest created by her execution of the deed of trust in 2007 and, therefore, Defendants now have no secured interest to foreclose upon. Additionally, Jenkins's FAC alleged Defendants violated numerous state and federal laws with regard to the servicing of her loan and the initiation of nonjudicial foreclosure.

Chase demurred to the FAC, asserting Jenkins had not stated a valid claim as a matter of law. The court sustained the demurrers to the first, second, third, and fifth causes of action, but gave Jenkins leave to amend these four claims. The court also sustained the demurrer to the TILA cause of action without leave to amend.

Jenkins filed her SAC on July 20, 2011, which again alleged causes of action for: (1) unfair business practices; (2) breach of good faith and fair dealing; and (3) violations of RESPA. She replaced the cause of action for lack of standing to foreclose in her FAC with claims for declaratory relief and a violation of Civil Code section 2932.5.[1]

---

[1]     All further statutory references are to the Civil Code, unless otherwise indicated.

4

Jenkins's SAC, like her FAC, focused on the alleged improper securitization and lack of compliance with the securitized investment trust's pooling and servicing agreement. Chase and B of A filed a joint demurrer and Quality filed its own separate demurrer to the SAC. The court sustained both demurrers without leave to amend.

The court offered several reasons for its ruling. It explained Jenkins failed to state a basis for declaratory relief because: (1) production of the note is not required to perfect foreclosure; (2) Jenkins was not a party or a third party beneficiary to the securitized investment trust's pooling and servicing agreement; and (3) California does not recognize a preemptive suit challenging a foreclosing party's right or ability to foreclose.

The court reasoned Jenkins's claim for violation of section 2932.5 lacked merit because the statute applies only to a mortgage and not to a deed of trust. In light of Jenkins's admission the note was secured by a deed of trust on her property and not a mortgage, the court concluded the statute was inapplicable.

The court determined Jenkins's claim for breach of the implied covenant of good faith and fair dealing lacked merit because Jenkins failed to allege the existence of a contract. Moreover, the court found there is generally no implied covenant relating to the decision to extend or not to extend (i.e., refinance) a loan. And to the extent the alleged breach related to underwriting, lending, and/or servicing errors by WaMu, those alleged liabilities were never assumed by Chase or Quality.

The court rejected Jenkins's Business and Professions Code section 17200 cause of action on the grounds she failed to allege facts to support her claim Defendants prepared and publicly recorded false documents. Finally, the court sustained the demurrer to Jenkins's RESPA claim because she failed to allege damages from Chase's delayed response, or a pattern or practice of noncompliance to support the statutory de minimus penalty.

5

DISCUSSION

*A.  Defendants' Demurrers were Properly Sustained Without Leave to Amend.*

   *1.  Standard of Review*

When reviewing a court's dismissal of a lawsuit following an order sustaining a demurrer without leave to amend, we initially review the complaint de novo to determine whether, as a matter of law, the complaint alleges a valid cause of action. (*Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1153 (*Gomes*).) We assume the truth of all properly pleaded and judicially noticeable material facts within the complaint, but we do not assume "'"'"contentions, deductions or conclusions of fact or law.'"'"' (*Herrera v. Federal National Mortgage Assn.* (2012) 205 Cal.App.4th 1495, 1501 (*Herrera*).)  We must read the complaint "'"'"as a whole and its parts in their context'"'"' in order to ensure that "'"'"we give the complaint a reasonable interpretation.'"'"'  (*Ibid.*)

If we conclude the complaint fails on any grounds stated in the demurrer, we must then consider whether there is a "'reasonable possibility'" the complaint's defect(s) can be cured by an amendment.  (*Gomes, supra,* 192 Cal.App.4th at p. 1153.)  If it is apparent the complaint's defects can be cured, the trial court has abused its discretion and we will reverse the judgment.  (*Ibid.*)  Alternatively, if it is apparent the complaint's defects cannot be cured, no abuse of discretion has occurred and we will affirm the judgment.  (*Ibid.*)  The burden of proving the reasonable possibility of such a curative amendment falls "'"'"squarely on the plaintiff."  [Citation.]'  [Citations.]"  (*Herrera, supra*, 205 Cal.App.4th at p. 1501.)

Furthermore, where the plaintiff requests leave to amend the complaint, but the record fails to suggest how the plaintiff could cure the complaint's defects, "the question as to whether or not [the] court abused its discretion [in denying the plaintiff's request] is open on appeal. . . ."  (Code Civ. Proc., § 472c, subd. (a).)  Because the trial court's discretion is at issue, we are limited to determining whether the trial court's

6

discretion was abused as a matter of law. (*Herrera, supra*, 205 Cal.App.4th at p. 1501.) Absent an effective request for leave to amend the complaint in specified ways, an abuse of discretion can be found "'only if a potentially effective amendment were both apparent and consistent with the plaintiff's theory of the case.' [Citation.]" (*Ibid.*)

    2. *Applicable Law*

        The financing or refinancing of real property in California is generally accomplished by the use of a deed of trust.[2] (*Calvo v. HSBC Bank USA, N.A.* (2011) 199 Cal.App.4th 118, 125.) The California Civil Code does not provide a statutory form for a deed of trust, nor do the statutes set forth the provisions such an instrument must include to be effective. However, the validity of trust deeds as real property security devices is clearly implied by the nonjudicial foreclosure statutes regulating their enforcement. (§ 2924 et seq.) Also, despite the absence of express statutory provisions setting forth the requirements of trust deeds, it is beyond dispute a deed of trust must be in writing to be valid, as any conveyance of real property must fulfill the statute of frauds requirement. (*Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 552.)

---

[2]    The deed of trust surpassed the common-law mortgage as the "generally accepted and preferred security device in California" during the 19th and early 20th Century, before the California Legislature eliminated *most* of the legal and economic distinctions between a mortgage that contains a power of sale and a deed of trust. (4 Cal. Real Est. § 10:1 (3d ed.).) "[I]n California there is little practical difference between mortgages and deeds of trust, . . . they perform the same basic function, and . . . a deed of trust is 'practically and substantially only a mortgage with power of sale.' . . . [A]lthough 'there are no statutory provisions dictating the form or stating the effect of deeds of trust' [citation omitted], deeds of trust are analogized to mortgages[,] and the same rules are generally applied to deeds of trust that are applied to mortgages. [Citations.]" (*Domarad v. Fisher & Burke, Inc.* (1969) 270 Cal.App.2d 543, 553 (*Domarad*).) Both mortgages and deeds of trust are subject to the same: (1) procedures and limitations on judicial and nonjudicial foreclosure (§ 2924 et seq. & § 2931); (2) redemption provisions both prior to and after the foreclosure sale (§§ 2903-2906; Code Civ. Proc., §§ 729.010-729.090); (3) reinstatement provisions prior to the foreclosure sale (§ 2924c); and (4) antideficiency limitations (Code Civ. Proc., §§ 580a-580d, 726).

A deed of trust, by way of a written instrument, conveys title to real property from the trustor-debtor to a third party trustee to secure the payment of a debt owed to the beneficiary-creditor under a promissory note. (See 13 Am. Jur. Legal Forms 2d (2013) Mortgages and Trust Deeds, § 179:69 [sample deed of trust form used in California]; 3 Miller & Starr, Cal. Real Estate Forms (3d ed. 2012) § 3:8 [sample California deed of trust].) The customary provisions of a valid deed of trust include a power of sale clause, which empowers the beneficiary-creditor to foreclosure on the real property security if the trustor-debtor fails to pay back the debt owed under the promissory note. (*Ibid.*)

Despite the existence and validity of the secured interest created by a deed of trust, the trustor-debtor retains all incidents of ownership with regard to the real property, including the rights of possession and sale. (*Hagge v. Drew* (1945) 27 Cal.2d 368, 376.) "The trustee of a deed of trust is not a true trustee, and owes no fiduciary obligations; he merely acts as a common agent for the trustor and the beneficiary of the deed of trust. [Citation.]" (*Vournas v. Fidelity Nat. Tit. Ins. Co.* (1999) 73 Cal.App.4th 668, 677.) Furthermore, an enforceable deed of trust requires the trustee to execute only one of the following mutually exclusive duties: (1) should the trustor-debtor default on the debt, the trustee must initiate foreclosure on the property for the benefit of the beneficiary-creditor; or (2) should the trustor-debtor satisfy the secured debt, the trustee must reconvey title to the real property back to the trustor-debtor, extinguishing the security device. (*Ibid*.)

Interestingly, although the deed of trust technically conveys title to the real property from the trustor-debtor to the trustee, the extent of the trustee's interest in the property is limited to what is necessary to enforce the operative provisions of the deed of trust. (*Monterey S. P. Partnership v. W. L. Bangham, Inc.* (1989) 49 Cal.3d 454, 460.) Consequently, California courts have described the security interest created by a deed of trust as the functional equivalent of "a lien on the property." (*Ibid*.)

Upon a trustor-debtor's default on a debt secured by a deed of trust, the beneficiary-creditor may elect to judicially or nonjudicially foreclose on the real property security. Sections 2924 through 2924k set forth a "comprehensive framework for the regulation of a *nonjudicial* foreclosure sale pursuant to a power of sale contained in a deed of trust." (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830, italics added (*Moeller*).)

Pursuant to this statutory scheme, the beneficiary-creditor under a deed of trust may declare a default and proceed with a foreclosure sale if the trustor-debtor defaults on the secured loan. (§ 2924.) To initiate the nonjudicial foreclosure process, the "trustee, mortgagee, or beneficiary, or any of their authorized agents," must record a notice of default and election to sell. (§ 2924, subd. (a)(1).) Except for one limited exception, the notice of default must be recorded for at least three months before the next step in the foreclosure process may proceed, presumably to make sure the debtor has notice of the impending sale and has time to pursue opportunities to cure the default. (§ 2924, subd. (a)(2).) After the three-month period has elapsed, a notice of sale must be published, posted, recorded and mailed 20 days before the foreclosure sale. (§§ 2924, subd. (a)(3), 2924f.)

Notably, as has occurred in the present case, the foreclosure sale may be postponed at any time before the sale is completed. (§ 2924g.) If the foreclosure sale is postponed, the statutes require that proper notice be given before the sale may be conducted at a later date. (§ 2924g, subd. (d).) Should the foreclosure sale occur after proper notice has been provided, the statute requires the foreclosed property be sold at public auction to the highest bidder. (§ 2924g, subd. (a); *Homestead Savings v. Darmiento* (1991) 230 Cal.App.3d 424, 433.)

The statutory scheme also provides the debtor with several opportunities throughout the foreclosure process to cure the default and avoid the sale of the property. First, the debtor is entitled to a period of reinstatement, during which the trustor-debtor may bring the loan payments up to date and have the terms of the loan reinstated.

9

(§ 2924c, subd. (a)(1); *Napue v. Gor-Mey West, Inc.* (1985) 175 Cal.App.3d 608, 614.) This period of reinstatement continues until five business days prior to the date of the foreclosure sale, and takes into account any postponements in the sale. (§ 2924c, subd. (e).) In addition to the right of reinstatement, the debtor may invoke the equity of redemption, which allows the debtor to avoid foreclosure by paying the total outstanding debt prior to the sale of the property. (§§ 2903, 2905.) Additionally, the debtor has the right to postpone the foreclosure sale for one day to pay off the outstanding debt. (*Whitman v. Transtate Title Co.* (1985) 165 Cal.App.3d 312, 317-320.)

Importantly, the provisions setting forth California's nonjudicial foreclosure scheme (§§ 2924-2924k) "'cover every aspect of [the] exercise of [a] power of sale contained in a deed of trust.' [Citation.] 'The purposes of this comprehensive scheme are threefold: (1) to provide the [beneficiary-creditor] with a quick, inexpensive and efficient remedy against a defaulting [trustor-debtor]; (2) to protect the [trustor-debtor] from wrongful loss of the property; and (3) to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser.' [Citation.]" (*Gomes*, *supra*, 192 Cal.App.4th at p. 1154.) "Significantly, '[n]onjudicial foreclosure is less expensive and more quickly concluded than judicial foreclosure, since there is no oversight by a court, "[n]either appraisal nor judicial determination of fair value is required," and the debtor has no postsale right of redemption.' [Citation.]" (*Id*. at p. 1155.)

Although a defaulting debtor is free to pursue a judicial action for "misconduct arising out of a nonjudicial foreclosure sale when [such a claim is] *not inconsistent with the policies behind the statutes*" (*California Golf, L.L.C. v. Cooper* (2008) 163 Cal.App.4th 1053, 1070, italics added), due to the "'exhaustive nature'" of this scheme, California appellate courts have refused to read any additional requirements into the nonjudicial foreclosure statute. [Citations.]" (*Gomes, supra,* 192 Cal.App.4th

at p. 1154, fn. omitted.) As one appellate court stated: "It would be inconsistent with the comprehensive and exhaustive statutory scheme regulating nonjudicial foreclosures to incorporate another unrelated cure provision into statutory nonjudicial foreclosure proceedings." (*Moeller*, *supra,* 25 Cal.App.4th at p. 834.)

### 3. First Cause of Action—Declaratory Relief

Jenkins's first cause of action in her SAC requests declaratory relief on the issue of whether Defendants have the authority to initiate nonjudicial foreclosure on her home. Jenkins asserts Defendants do not have the right to initiate nonjudicial foreclose because they do not have a secured interest in her home to foreclose upon. Based on "information and belief," Jenkins contends Defendants do not have a secured interest in her home, despite her admitted execution of the deed of trust in 2007, because the terms of the investment trust's pooling and servicing agreement were not complied with when her loan was pooled with other home loans and securitized. More specifically, Jenkins asserts the terms of the pooling and serving agreement were violated because: (1) the promissory note was not transferred into the investment trust with a complete and unbroken chain of endorsements and transfers; and (2) the trustee of the investment trust did not have actual physical possession of the note and deed of trust prior to the closing date of the investment trust.

In an attempt to allege facts to support her contentions, Jenkins's SAC states her assertions are evidenced by: (1) her contention Defendants "cannot produce any evidence that the promissory note has been transferred"; (2) the fact the recorded "Notice of Default does not establish that endorsements [of the promissory note] were made"; and (3) her contention "there [are not] any other notices which establish that the original lender endorsed and sold the note to another party." Furthermore, in her opening brief, Jenkins says she will allege "additional facts regarding Defendants' involvement in the improper securitization of this mortgage" if given the opportunity to amend her

11

complaint; however, her opening brief does not explain or suggest what those additional facts may be.

Jenkins's first cause of action also alleges—based on her above assertion Defendants do not have a secured interest to foreclose upon—the notice of default, substitution of trustee, and additional documents recorded by Defendants after she defaulted on her loan were "falsely or fraudulently" prepared by Defendants. Moreover, Jenkins alleges Quality did not have standing to commence nonjudicial foreclosure by filing the notice of default on April 30, 2010, because Quality was not the trustee under the deed of trust until the substitution of trustee was recorded on June 11, 2010. Also, for the first time in her opening brief, Jenkins alleges Defendants violated 15 U.S.C. section 1641(g), when the promissory note was allegedly transferred to Freddie Mac.

Based on these contentions, Jenkins's SAC requests: (1) a court order stating there is "no enforceable secured or unsecured claim against the Home"; (2) a court order declaring any assignment(s) of the promissory note subsequent to the "closing date" of the investment trust "void and a legal nullity, in willful violation of New York trust law and of relevant portions of the [investment trust's pooling and servicing agreement]"; (3) a "[p]reliminary and [p]ermanent [i]njunction enjoining any and all [t]rustee [s]ales which may be scheduled by the Defendants"; (4) a court order prohibiting the "filing [of] an unlawful detainer action or any other action" against Jenkins by Defendants; and (5) the "[c]ancelation of the [d]eed of [t]rust pursuant to [section] 3412." In essence, Jenkins's first cause of action seeks a judicial order directing Defendants to prove they possess the promissory note, with endorsements, before they are allowed to proceed with the nonjudicial foreclosure on her home.

12

*a. Jenkins cannot identify a legal basis for an action to challenge Defendants' authority to initiate nonjudicial foreclosure.*

California courts have refused to delay the nonjudicial foreclosure process by allowing trustor-debtors to pursue preemptive judicial actions to challenge the right, power, and authority of a foreclosing "beneficiary" or beneficiary's "agent" to initiate and pursue foreclosure. (See *Debrunner v. Deutsche Bank National Trust Co.* (2012) 204 Cal.App.4th 433, 440-442 (*Debrunner*); *Gomes, supra,* 192 Cal.App.4th at pp. 1154-1157.) In *Gomes*, our colleagues in Division One considered whether California's nonjudicial foreclosure statutes allow a defaulting trustor-debtor, before his or her property is sold, to bring a preemptive judicial action to challenge whether the person initiating the foreclosure is, or is duly authorized to do so by, the person who possesses a secured interest in the property. (*Gomes, supra,* 192 Cal.App.4th at p. 1152.) Much like Jenkins's first cause of action, the appellant in *Gomes* alleged, "on information and belief," the entity who initiated the nonjudicial foreclosure process did not have the authority to do so because (1) the entity was not the owner of the promissory note that was secured by the deed of trust and (2) the entity was not an authorized agent of the owner of the promissory note. (*Ibid.*)

In the *Gomes* court's analysis of the validity of the appellant's claim, it made the important point that such a preemptive action does not seek a remedy for a foreclosing party's misconduct with regards to the initiation and processing of the nonjudicial foreclosure, which, as we noted above, may serve as the basis for a valid cause of action. (*Gomes*, *supra*, 192 Cal.App.4th at p. 1154, fn. 5.) Instead, the *Gomes* court found that such a preemptive action seeks to create "the additional requirement" that the foreclosing entity must "demonstrate *in court* that it is authorized to initiate a foreclosure" before the foreclosure can proceed. (*Ibid.*, italics added.) After examining the nonjudicial foreclosure statutes and considering the well-established purposes of nonjudicial foreclosure, the *Gomes* court found no express or implied grounds for

13

allowing such a preemptive action. (*Id*. at p. 1156.) Consequently, the *Gomes* court concluded that allowing a trustor-debtor to pursue such an action, absent a "*specific factual basis* for alleging that the foreclosure was not initiated by the correct party" would unnecessarily "interject the courts into [the] comprehensive nonjudicial scheme" created by the Legislature, and "would be inconsistent with the policy behind nonjudicial foreclosure of providing a quick, inexpensive and efficient remedy. [Citation.]" (*Id*. at pp. 1154-1156.)

In *Debrunner, supra,* 204 Cal.App.4th 433, our Sixth District colleagues answered the more specific question of whether the foreclosing party must have actual possession of the promissory note and be able to produce it in order to pursue nonjudicial foreclosure. The *Debrunner* court, based on much of the same reasoning found in the *Gomes* decision, particularly the absence of any express requirement in the nonjudicial foreclosure statutes, concluded the foreclosing beneficiary-creditor need not produce the promissory note or otherwise prove it holds the note to nonjudicially foreclosure on a real property security. (*Id*. at pp. 440-442.)

Jenkins's first cause of action, like the claim brought by the appellant in *Gomes*, asserts she has a right to bring a preemptive judicial action to determine whether Defendants have the authority to initiate nonjudicial foreclosure on her home; however, like the appellant in *Gomes*, she fails to identify legal authority for such a preemptive action in the statutory provisions setting forth the nonjudicial foreclosure scheme. After our own examination of the nonjudicial foreclosure statutes, we agree with the *Gomes* court that the provisions do not contain express authority for such a preemptive action. Also, even if the statutes are interpreted broadly, it cannot be said the provisions imply the authority for such a preemptive action exists, because doing so would result in the impermissible interjection of the courts into a nonjudicial scheme enacted by the California Legislature. (See *Lu v. Hawaiian Gardens Casino, Inc.* (2010) 50 Cal.4th 592, 596 [legislative intent to create cause of action revealed through interpretation of statute

14

and legislative history]; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 80 (*City of Cotati*) [plaintiff may not use claim for declaratory relief to "'create a cause of action that otherwise does not exist'"].) "The recognition of the right to bring a lawsuit to determine a nominee's authorization to proceed with foreclosure on behalf of the note holder would fundamentally undermine the nonjudicial nature of the process and introduce the possibility of lawsuits filed solely for the purpose of delaying valid foreclosures." (*Gomes*, *supra*, 192 Cal.App.4th at p. 1155.)

Moreover, we find the statutory provisions, because they broadly authorize a "trustee, mortgagee, or beneficiary, or *any of their authorized agents*" to initiate a nonjudicial foreclosure (§ 2924, subd. (a)(1), italics added), do not require that the foreclosing party have an actual beneficial interest in both the promissory note and deed of trust to commence and execute a nonjudicial foreclosure sale. Thus, we conclude the court properly sustained Defendants' demurrers to the first cause of action in Jenkins's SAC.

b. *Jenkins fails to show an actual controversy exists between herself and Defendants.*

Alternatively, even if we found a proper legal basis for such a preemptive suit existed, Jenkins's first cause of action fails to set forth a valid claim for declaratory relief because she cannot show an actual controversy exists between herself and Defendants. Code of Civil Procedure section 1060 authorizes "[a]ny person . . . who desires a declaration of his or her rights or duties with respect to another . . . in cases of *actual controversy relating to the legal rights and duties of the respective parties*, [to] bring an original action . . . for a declaration of his or her rights and duties . . . ." (Code Civ. Proc., § 1060, italics added.) "'The fundamental basis of declaratory relief is the existence of an *actual, present controversy* over a proper subject.' [Citation.]" (*City of Cotati*, *supra*, 29 Cal.4th at p. 79.) In order for a party to pursue an action for declaratory relief, the "'actual, present controversy *must be pleaded specifically.*'" (*Id.* at p. 80,

15

italics added.)  Thus, a claim must provide specific facts, as opposed to conclusions of law, which show a "controversy of concrete actuality."  (*Jessin v. County of Shasta* (1969) 274 Cal.App.2d 737, 743 (*Jessin*).)  Whether a claim presents an """"actual controversy" within the meaning of Code of Civil Procedure section 1060 is a question of law that we review de novo.'  [Citation.]"  (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 606.)

As we summarized in more detail above, Jenkins's cause of action for declaratory relief is grounded on her assertion Defendants do not have a secured interest in her home to foreclose upon because of alleged non-compliance with the terms of the investment trust's pooling and servicing agreement when her loan was purportedly pooled with other home loans and securitized.  In her complaint, and again in her opening brief, Jenkins asserts that an actual controversy exists between herself and Defendants as to whether Defendants have an enforceable secured interest in her home.  We disagree.

Jenkins acknowledges in both her SAC and opening brief that she executed both a promissory note in the amount of $375,500, and a deed of trust securing her debt on March 23, 2007, and she attached copies of these documents to her SAC as exhibits A and B.  Consequently, there is no dispute between the parties as to the existence of the secured home loan debt.  There is also no dispute the deed of trust contains:  (1) an explicit power of sale clause in favor of the beneficiary-creditor; (2) provisions setting forth Jenkins's obligations with regard to repaying the loan and maintaining the property; and (3) provisions stating the beneficiary-creditor may transfer the promissory note at any time without providing notice of the transfer to Jenkins.

Furthermore, Jenkins acknowledges in both her SAC and opening brief that she defaulted on the secured debt and the debt remains in arrears.  Indisputably, Jenkins's default on the secured debt triggered the beneficiary-creditor's option under the deed of trust's power of sale clause, and section 2924 allows the "trustee, mortgagee, or

16

beneficiary, or any of their authorized agents" to record a notice of default and election to sell the real property security, thus initiating the nonjudicial foreclosure process.

Despite these facts, Jenkins's first cause of action attempts to construct a dispute between herself and Defendants with regard to the alleged improper transfer of the promissory note during the securitization process. However, even if the asserted improper securitization (or any other invalid assignments or transfers of the promissory note subsequent to her execution of the note on March 23, 2007) occurred, the relevant parties to such a transaction were the holders (transferors) of the promissory note and the third party acquirers (transferees) of the note. "Because a promissory note is a negotiable instrument, a borrower must anticipate it can and might be transferred to another creditor. As to plaintiff, an assignment merely substituted one creditor for another, without changing her obligations under the note." (*Herrera, supra,* 205 Cal.App.4th at p. 1507.) As an unrelated third party to the alleged securitization, and any other subsequent transfers of the beneficial interest under the promissory note, Jenkins lacks standing to enforce any agreements, including the investment trust's pooling and servicing agreement, relating to such transactions. (See *In re Correia* (Bankr. 1st Cir. 2011) 452 B.R. 319, 324-325 [debtors lacked standing to raise violations of pooling and service agreement].)

Furthermore, even if any subsequent transfers of the promissory note were invalid, Jenkins is not the victim of such invalid transfers because her obligations under the note remained unchanged. Instead, the true victim may be an entity or individual who believes it has a present beneficial interest in the promissory note and may suffer the unauthorized loss of their interest in the note. It is also possible to imagine one or many invalid transfers of the promissory note may cause a string of civil lawsuits between transferors and transferees. Jenkins, however, may not assume the theoretical claims of hypothetical transferors and transferees for the purposes of showing a "controversy of concrete actuality." (See *Jessin, supra*, 274 Cal.App.2d at p. 743.) Consequently, we

17

conclude Jenkins's first cause of action lacks merit for the independent reason she cannot show the existence of an actual, present controversy between herself and Defendants. (See *City of Cotati, supra*, 29 Cal.4th at p. 79; *Jessin*, *supra*, 274 Cal.App.2d at pp. 743-744.)

   *c. Jenkins fails to state a valid claim relating to Quality's filing of the notice of default.*

   As a separate ground for her first cause of action for declaratory relief, Jenkins's SAC asserts Quality impermissibly recorded the notice of default on April 30, 2010, because Quality "was not yet the [t]rustee or an authorized agent." Jenkins contends Quality did not have standing to commence nonjudicial foreclosure when the notice of default was recorded on April 30, 2010, because Quality was not the trustee under the deed of trust as of that date. According to Jenkins, Quality did not have standing to commence nonjudicial foreclosure as the trustee until after (1) the original trustee received notice of the substitution of trustee by mail and (2) the substitution of trustee was recorded, which occurred on June 11, 2010.

   This argument fails to recognize Quality recorded the notice of default on April 30, 2010 "as agent for beneficiary," rather than as the trustee under the deed of trust. Jenkins attached the notice of default to her SAC as exhibit C, and the signature line of that document states Quality was initiating the nonjudicial foreclosure "as agent for beneficiary." The nonjudicial foreclosure scheme enacted by the Legislature authorizes the "trustee, mortgagee, or beneficiary, *or any of their authorized agents*" to record a notice of default and election to sell upon the trustor-debtors default on the secured debt. (§ 2924, subd. (a)(1), italics added.) Thus, because an agent for the beneficiary may record a notice of default, Jenkins's assertion Quality lacked standing to initiate the nonjudicial foreclosure of her home is without merit and cannot serve as the basis for her declaratory relief claim.

*d. Jenkins cannot bring a claim against Defendants for Freddie Mac's alleged violation of 15 U.S.C. section 1641(g).*

For the first time in her opening brief, Jenkins asserts, as a separate grounds for her declaratory relief claim, Defendants transferred the promissory note to Freddie Mac in violation of 15 U.S.C. section 1641(g). Although Jenkins's opening brief is not clear on this point, our liberal reading of her brief leads us to believe she is asserting the alleged violation of 15 U.S.C. section 1641(g) extinguished the secured interest created by the deed of trust.

Title 15 United States Code section 1641(g), which was added by the enactment of the Helping Families Save Their Homes Act, became effective on May 20, 2009. The provisions of 15 U.S.C. section 1641(g) require "the new owner or assignee" (i.e., transferee) of a mortgage loan (e.g., a promissory note) to provide the mortgage borrower (e.g., trustor-debtor) with written notice of the sale, transfer, or assignment in which the mortgage loan was acquired. (15 U.S.C. § 1641(g).) The notice must be provided "not later than 30 days after the date on which [the] mortgage loan is sold or otherwise transferred or assigned to [the new owner or assignee]." (15 U.S.C. § 1641(g).) The notice must include: (1) "the identity, address, telephone number of the new creditor"; (2) "the date of transfer"; (3) "how to reach an agent or party having authority to act on behalf of the new creditor"; (4) "the location of the place where transfer of ownership of the debt is recorded"; and (5) "any other relevant information regarding the new creditor." (15 U.S.C. § 1641(g).)

Jenkins's claim for violation of 15 U.S.C. section 1641(g) must fail because the statutory obligation to notify the mortgage loan borrower is only applicable to creditors who are the *new owners or assignees* of a mortgage loan, and not the transferors of the mortgage loan. (*Jara v. Aurora Loan Servs* (N.D.Cal. 2012) 852 F.Supp.2d 1204, 1208-1209.) In the present case, Jenkins clearly alleges the violation of 15 U.S.C.

19

section 1641(g) occurred when the promissory note was transferred *from Defendants to Freddie Mac*. Because Jenkins does not allege Defendants were the new owners or assignees of the promissory note when the alleged statutory violation occurred, she cannot claim Defendants violated any obligations under 15 U.S.C. section 1641(g). Thus, Jenkins cannot proceed with a declaratory relief action grounded on an unfeasible statutory claim.

   *e. Jenkins cannot cure the defects in her first cause of action.*

   We must also consider whether Jenkins has shown there is a reasonable possibility she could cure the defects we have identified in her first cause of action by way of an amendment to her SAC. (*Herrera*, *supra*, 205 Cal.App.4th at p. 1501; *Gomes*, *supra*, 192 Cal.App.4th at p. 1153.) With regard to this question, Jenkins, in her opening brief, states she could amend her first cause of action to plead "additional facts regarding Defendants' involvement in the improper securitization of this mortgage."

   As we discussed in great detail above, the flaws in Jenkins's first cause of action are: (1) the statutory nonjudicial foreclosure scheme does not permit a preemptive judicial action to challenge Defendants' authority to initiate nonjudicial foreclosure on her home; (2) even if such a preemptive lawsuit were permissible, Jenkins cannot show an actual controversy exists between herself and Defendants because she lacks standing to sue for the enforcement of the investment trust's pooling and servicing agreement; (3) Jenkins cannot base a claim for declaratory relief against Defendants for Freddie Mac's alleged violation of 15 U.S.C. section 1641(g); and (4) because the nonjudicial foreclosure statutes expressly permit the recording of a notice of default by an agent for the beneficiary, Jenkins cannot base her claim for declaratory relief on Quality's recording of the notice of default. These flaws cannot be cured by the pleading of additional facts relating to Defendants' actions with regard to the securitization of the promissory note. They are incurable errors, unrelated to the sufficiency of the facts pleaded by Jenkins that cannot be repaired or reconstructed by an amendment.

20

Therefore, we concluded the court properly sustained the demurrer without leave to amend to Jenkins's first cause of action.

   *4. Second Cause of Action—Violation of Section 2932.5*

    Jenkins's second cause of action, like her first cause of action, tries to refute the existence of Defendants' secured interest in the home and, consequently, their power to nonjudicially foreclose on the home.  She attacks the validity of Defendants' secured interest by asserting the transfers of the promissory note during the alleged securitization process did not conform with the provisions of section 2932.5.  Her claim contends the invalid transfers rendered the promissory note "non-negotiable," extinguishing the secured interest that was created when she executed the deed of trust in 2007.  The claim fails because Section 2932.5 is inapplicable to deeds of trust.

    Section 2932.5 states:  "Where a power to sell real property is *given to a mortgagee, or other encumbrancer*, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person which by assignment becomes entitled to payment of the money secured by the instrument.  The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded." (Italics added.)

    As we noted at the outset of this opinion, the Legislature has eliminated *most* of the legal and economic distinctions between a mortgage containing a power of sale and a deed of trust.  (*Domarad*, *supra*, 270 Cal.App.2d at p. 553 [holding same rules are *generally* applied to mortgages and deeds of trust because there is "little practical difference between" the two instruments].)  However, some distinctions between the two security devices endure.  Probably the most significant distinction is the execution of a mortgage involves only two parties (i.e., the mortgagor and mortgagee); whereas the execution of a deed of trust necessarily involves three parties (i.e., the trustor-debtor, beneficiary-creditor, and trustee) because title to the real property and the power of sale

21

are conveyed to the third party trustee, who holds the interest for the benefit of the beneficiary-creditor. (See *Herrera, supra,* 205 Cal.App.4th at p. 1510.)

It is well settled California law that this distinction makes the provisions of section 2932.5 inapplicable to trust deeds. (*Herrera, supra,* 205 Cal.App.4th at pp. 1509-1510; *Haynes v. EMC Mortgage Corp.* (2012) 205 Cal.App.4th 329, 332-337 (*Haynes*).) California appellate courts have explained that, because a deed of trust does not convey a power of sale directly to the beneficiary-creditor, it is immaterial whether an assignment of a promissory note was properly acknowledged and recorded when a deed of trust is used to secure a debt. (*Herrera*, *supra*, 205 Cal.App.4th at pp. 1509-1510; *Haynes*, *supra*, 205 Cal.App.4th at pp. 332-333.)

As the *Haynes* court explained, "section 2932.5's purpose is not to ensure that borrowers can identify who is holding their loans. Section 2932.5 requires the recorded assignment of a mortgage so that a prospective purchaser knows that the mortgagee has the authority to exercise the power of sale. This is not necessary when a deed of trust is involved, as the trustee conducts the sale and transfers title. [Citation.] It is the trustee's holding and transferring of title that underlies the application of different recording requirements than those required of mortgagees under section 2932.5. . . . [T]he literal application of section 2932.5 to deeds of trust would effectively require the power of sale to be transferred to the lender, contrary to the terms of the trust deed and of section 2934a which provides detailed requirements for the transfer of the power of sale to another *trustee*." (*Haynes*, *supra*, 205 Cal.App.4th at p. 336, fn. omitted.) We agree with the *Haynes* court that the transferee of a promissory note secured by a deed of trust is not a *mortgagee, or other encumbrancer* to whom a power of sale is given within the meaning of section 2932.5, and such a transferee need not have a duly acknowledged and recorded interest in the promissory note before exercising the power of sale. (*Haynes*, *supra*, 205 Cal.App.4th at p. 333.)

In light of Jenkins's repeated acknowledgment her promissory note was secured by a deed of trust, it would be impossible for her to cure the fundamental defects in her second cause of action by way of an amendment. Accordingly, the court's sustainment of Defendants' demurrer without leave to amend to Jenkins's second cause of action was proper.

5. *Third Cause of Action—Violations of Business and Professions Code Section 17200 et seq.*

Jenkins's third cause of action asserts Defendants engaged in numerous unlawful, unfair, and fraudulent business practices in violation of Business and Professions Code section 17200. First, Jenkins's SAC asserts Defendants violated Penal Code section 115.5, subsection (a), by recording allegedly fraudulent documents Defendants purportedly procured to fill the missing gaps in the chain of title or to falsely demonstrate compliance with the investment trust's pooling and servicing agreement and California's nonjudicial foreclosure statutes. Second, Jenkins's SAC alleges Chase violated provisions of RESPA by failing to timely acknowledge receipt of her "Qualified Written Request" (QWR) and by failing to provide an adequate response to her QWR. Third, Jenkins's SAC alleges Quality breached California's nonjudicial foreclosure statues (§ 2924 et seq.) by executing and recording the notice of default, which initiated the nonjudicial foreclosure process before Quality was substituted in as trustee under the deed of trust. Fourth, Jenkins's SAC alleges Chase violated Penal Code section 115.5, subdivision (b), by making misrepresentations, including false sworn statements, to a notary public to cause the notary public to perform an improper notarizing act. Fifth, Jenkins's SAC alleges Chase committed an unlawful business practice by using an alleged "Robo-[s]igner" to execute the purportedly fraudulent substitution of trustee. Sixth, in her opening brief, Jenkins asserts Defendants' alleged violation of section 2932.5 was an unlawful business practice.

Jenkins SAC asserts these alleged unlawful, unfair, and fraudulent business practices caused her to incur the following damages: (1) her home is "*subject to foreclosure*"; and (2) monetary damages totaling "at least the sum of the jurisdictional amount . . . plus interest, attorney's fees and costs, and additional amounts." (Italics added.) Jenkins also asserts these alleged unfair business practices entitle her to a preliminary injunction prohibiting Defendants from foreclosing on her home.

Sections 17200 through 17210 of the Business and Professions Code do not have a specific statutory title; however, California courts have referred to these statutes as the Unfair Competition Law (UCL). (See *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 169 (*Cel-Tech*).) In order "to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services" (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949), the "UCL prohibits, and provides civil remedies for, unfair competition." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320 (*Kwikset Corp*).) Under the UCL, any person or entity that has engaged, is engaging or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." (Bus. & Prof. Code, §§ 17201 & 17203.) Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code, § 17200.) A plaintiff may pursue a UCL action in order to obtain either (1) *injunctive relief*, "the primary form of relief available under the UCL," or (2) *restitution* "'as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.' [Citation.]" (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 319.)

The California Supreme Court has held the UCL's "coverage is 'sweeping, "'embracing anything that can properly be called a business practice and that at the same time is forbidden by law.'"' [Citations.]" (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180.) Furthermore, the UCL creates "three varieties of unfair competition—acts or practices

24

which are *unlawful*, or *unfair*, or *fraudulent*." (*Ibid.*, italics added.) The UCL's unlawful prong "'"borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citations.]" (*Ibid.*)

    *a. Jenkins lacks standing under Business and Professions Code section 17204.*

    Although the UCL's "substantive reach . . . remains expansive," the approval of Proposition 64 by the California electorate in November 2004 "substantially revised the UCL's standing requirement" for private individuals. (*Kwikset Corp., supra,* 51 Cal.4th at p. 320 [finding voters "materially curtailed the universe of those who may enforce" the UCL's provisions].) Before the approval of Proposition 64, Business and Professions Code section 17204 authorized "any person acting for the interests of itself, its members or the general public" to bring a UCL action. (Former Bus. & Prof. Code, § 17204, as amended by Stats.1993, ch. 926, § 2, p. 5198.) Today, in light of the amendments enacted by Proposition 64, Business and Professions Code section 17204 restricts private standing to bring a UCL action to "a person who has *suffered injury in fact* and has *lost money or property* as a *result* of unfair competition." (Bus. & Prof. Code, § 17204, as amended by Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004) § 3, italics added.)

    The California Supreme Court has explained the intent of Proposition 64's "change was to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of '"clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant . . . ."'" [Citations.]" (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 788.) However, despite Proposition 64's stricter standing requirements, the Supreme Court has been careful to note the initiative "plainly preserved

standing for those who *had* had business dealings with a defendant and had lost money or property *as a result of the defendant's unfair business practices*." (*Ibid.*, italics added.)

In *Kwikset Corp.*, the California Supreme Court considered the private standing requirements of Business and Professions Code section 17204, as amended by Proposition 64, and set forth "a simple test" to determine whether a plaintiff has standing to bring a private UCL action. (*Kwikset Corp.*, *supra*, 51 Cal.4th at p. 322.) "To satisfy the narrower standing requirements imposed by Proposition 64, a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that the economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." (*Ibid.*) A plaintiff must support each of the standing elements under Business and Professions Code section 17204 "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. [Citations.]" (*Kwikset Corp.*, *supra*, 51 Cal.4th at p. 327.) A UCL claim will survive a demurrer if the plaintiff can plead "general factual allegations of injury resulting from the defendant's conduct." (*Ibid.*)

The *Kwikset Corp.* court held a plaintiff can satisfy the *economic injury* prong of the standing requirements under Business and Professions Code section 17204 —i.e., show the plaintiff "personally suffered" an economic injury—in "innumerable ways" because "[n]either the text of Proposition 64 nor the ballot arguments in support of it purport to define or limit the concept of 'lost money or property.'" (*Kwikset Corp.*, *supra*, 51 Cal.4th at p. 323.) To aid lower courts with determining whether a plaintiff has properly alleged an economic injury under Business and Professions Code section 17204, the *Kwikset Corp.* court listed four injuries that would certainly qualify under the statute: (1) the plaintiff surrendering more or acquiring less in a transaction than the plaintiff otherwise would have; (2) the plaintiff suffering the diminishment of a present or future property interest; (3) the plaintiff being deprived of money or property to which the

26

plaintiff has a cognizable claim; or (4) the plaintiff being required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. (*Ibid.*) These four injuries are not "an exhaustive list" of the injuries a plaintiff may allege to properly plead an economic injury under Business and Professions Code section 17204, and "the quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact." (*Kwikset Corp.*, *supra*, 51 Cal.4th at pp. 323-324.)

Additionally, the *Kwikset Corp.* court held a plaintiff can satisfy the *causation* prong of the standing requirements under Business and Professions Code section 17240—i.e., show the "plaintiff's economic injury [occurred] 'as a result of' the unfair competition"—by showing a "causal connection" between the economic injury and the alleged unfair conduct. (*Kwikset Corp.*, *supra*, 51 Cal.4th at p. 326.) A plaintiff fails to satisfy the causation prong of the statute if he or she would have suffered "the same harm whether or not a defendant complied with the law." (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1099.)

In the present case, Jenkins's third cause of action asserts the economic injury she has suffered is the impending foreclosure of her home. It is undisputed nonjudicial foreclosure proceedings have been initiated on Jenkins's home. If such proceedings are pursued to their completion, Jenkins's interest in her property will be extinguished. Thus, in light of the minimal pleading requirements with regard to the economic injury prong of Business and Professions Code section 17204, and the *Kwikset Corp.* court's affirmation of an alleged diminishment of a future property interest as a sufficiently pled economic injury under the statute (*Kwikset Corp.*, *supra*, 51 Cal.4th at p. 323), we conclude Jenkins's third cause of action satisfies the economic injury prong of Business and Professions Code section 17204.

However, Jenkins's third cause of action must also satisfy the second prong of the standing requirements under Business and Professions Code section 17204 (i.e.,

causation), which required her to plead a causal link between her economic injury, the impending nonjudicial foreclosure of her home, and the six unfair or unlawful acts allegedly committed by Defendants. (Bus. & Prof. Code, § 17204.) Importantly, Jenkins admits in both her SAC and opening brief that she defaulted on her loan. It is also indisputable Jenkins's default triggered the lawful enforcement of the power of sale clause in the deed of trust, and it was the triggering of the power of sale clause that subjected Jenkins's home to nonjudicial foreclosure. Moreover, Jenkins's SAC and opening brief acknowledge her default occurred *prior to* the six unlawful or unfair acts she alleges as the basis of her UCL action. As Jenkins's home was subject to nonjudicial foreclosure because of Jenkins's default on her loan, which occurred before Defendants' alleged wrongful acts, Jenkins cannot assert the impending foreclosure of her home (i.e., her alleged economic injury) was caused by Defendants' wrongful actions. Thus, even if we assume Jenkins's third cause of action alleges facts indicating Defendants' actions violated at least one of the UCL's three unfair competition prongs (unlawful, unfair, or fraudulent), Jenkins's SAC cannot show any of the alleged violations have a causal link to her economic injury. In light of these facts, we conclude the demurrer to Jenkins's third cause of action was proper.

b. *Jenkins cannot cure the defect in her third cause of action*.

We now consider whether Jenkins has shown there is a reasonable possibility she could cure the standing defect by way of an amendment to her SAC. (*Gomes*, *supra*, 192 Cal.App.4th at p. 1153.) To cure the standing defect in her third cause of action, Jenkins would have to show she can plead facts indicating a causal link between her economic injury and Defendants' allegedly wrongful actions. In other words, Jenkins would have to amend her third cause of action to show she suffered her economic injury "*as a result of* the defendant's unfair business practices." (*Kwikset Corp.*, *supra*, 51 Cal.4th at p. 321, italics added.)

28

In her opening brief, Jenkins states that if she were permitted to amend her third cause of action she would "allege the facts with more specificity to illustrate the ways [Defendants] engaged in deceptive, unfair, and fraudulent conduct under both the 'unlawful' and 'unfairness' prongs of [the UCL]." She also lists additional unlawful acts allegedly committed by Defendants, which she would amend her third cause of action to allege.

Jenkins's purposed amendments would fail to cure her Business and Professions Code section 17204 standing defect. Amending the SAC to plead the previously asserted wrongful acts with more specificity will not change the fact these purported actions occurred *after* Jenkins's default on her loan. Likewise, amending the complaint to allege new wrongful acts, also occurring after her default, would not assist her. Because Jenkins cannot plead facts that would cure the standing defect in her complaint, we conclude the court properly sustained the demurrer without leave to amend as to the third cause of action.

*6. Fourth Cause of Action—Contractual Breach of the Implied Covenant of Good Faith and Fair Dealing*

Jenkins's fourth cause of action alleges Defendants breached the implied covenant of good faith and fair dealing. Jenkins's SAC alleges Quality breached its duty to act in good faith "by initiating unlawful disclosure proceedings." As to Chase, Jenkins's SAC asserts the bank violated the implied covenant of good faith and fair dealing by: (1) willfully withholding numerous disclosures; (2) willfully withholding notices of excessive fees, finance changes, underwriting standards, good faith estimates, and the dissemination of "negative credit scores"; (3) willfully inflating Jenkins's income to qualify her for a loan she would not have otherwise qualified for; (4) instructing Jenkins to default on her payments to qualify for a loan modification, then subsequently "rejecting her payments"; (5) "forcing [Jenkins] to resubmit loan modification documents

29

over a dozen times" in 2010; (6) "[c]onsistently making claims that [Jenkins] was denied a loan modification because she did not pay [for a] loan appraisal, which she did, or that her paperwork was not received, when she had in fact sent over [80] pages of documents to Chase numerous times"; (7) violating the Fair Debt Collection Practice Act, 15 U.S.C. 1601; (8) making false claims in recorded documents; (9) violating RESPA; and (10) "[i]ntentionally setting up its loan modification program to fail." Moreover, Jenkins's opening brief ostensibly argues Chase breached its contractual duty of good faith by violating section 2923.5.

The covenant of good faith and fair dealing is imposed upon each party to a contract. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 (*Carma Developers*).) This fundamental covenant prevents the contracting parties from taking actions that will deprive another party of the benefits of the agreement. (*Id.* at p. 372.) The covenant also requires each party to do everything the contract presupposes the party will do to accomplish the agreement's purposes. (*Harm v. Frasher* (1960) 181 Cal.App.2d 405, 417 (*Harm*).)

"It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." (*Carma Developers, supra*, 2 Cal.4th at p. 373.) "Because contracts differ, the nature and extent of the duties owed under the implied covenant are also variable and 'will depend on the contractual purposes.' [Citation.]" (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1147.) Thus, it is well settled the implied covenant does not extend so far as to impose enforceable duties that are beyond the scope of the contract, nor does the covenant prohibit actions that are expressly authorized by the contract's terms. (*Carma Developers, supra*, 2 Cal.4th at p. 374.)

A party's breach of the implied covenant of good faith and fair dealing gives rise to a contract claim. (See *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 55-56.) Importantly, it is also well settled "[t]he prerequisite

30

for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49 (*Smith*).) "Without a contractual underpinning, there is no independent claim for breach of the implied covenant." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1994) 21 Cal.App.4th 1586, 1599.)

### a. *Jenkins fails to plead facts to assert a claim against Quality.*

We first address the allegation Jenkins raises against Quality. Jenkins's SAC and opening brief fail to unambiguously identify a contract Quality allegedly breached, which is a "prerequisite for any action for breach of the implied covenant of good faith and fair dealing." (*Smith, supra,* 225 Cal.App.3d at p. 49.) However, for the purposes of our present analysis, we assume Jenkins's fourth cause of action asserts Quality breached the terms of the deed of trust, as it is the only instrument referenced in Jenkins's SAC in which both Quality and Jenkins may be held to enforceable duties. Consequently, we interpret Jenkins's fourth cause of action to allege Quality breached the deed of trust's implied covenant of good faith and fair dealing by purportedly initiating unlawful foreclosure proceedings.

This vague contention is insufficient to state a cause of action for breach of the implied covenant because Jenkins fails to plead facts describing how Quality either (1) deprived Jenkins of the right to receive any benefits under the deed of trust, or (2) refused to perform a specific act presupposed by the terms of the deed of trust. (*Carma Developers, supra,* 2 Cal.4th at p. 371; *Harm, supra,* 181 Cal.App.2d at p. 417.) The terms of the deed of trust, which Jenkins attached to her SAC as exhibit B, specifically set forth the trustee's limited duties. First, should the beneficiary-creditor invoke the power of sale clause, the deed of trust requires the trustee to: (1) execute a written notice of the trustor-creditor's default and the beneficiary-creditor's election to sell the property; (2) record the notice; and (3) mail copies of the notice to the

31

trustor-debtor.  Second, should the nonjudicial foreclosure proceed, the trustee is required to:  (1) sell the property to the highest bidder at an appropriate public auction; (2) deliver the trustee's deed to the purchaser without any express or implied covenants or warranties; and (3) apply the proceeds of the sale in a particular order set forth in the deed of trust.  Finally, if the trustor-debtor pays the entire debt secured by the property, the deed of trust requires the trustee to reconvey the property to the trustor-debtor and surrender the deed of trust.

It is undisputed Jenkins defaulted on her loan and, thereafter, Chase invoked the power of sale clause in the deed of trust.  The undisputed facts also show Quality, acting as an authorized agent for the beneficiary-creditor, executed, recorded, and mailed the notice of default and election to sell.  Moreover, Defendants have postponed the sale of the property.

Nowhere in Jenkins's SAC are facts alleged as to how Quality's actions violated an express or implied duty under the deed of trust.  Furthermore, given these undisputed facts, we cannot identify any plausible allegations as to how Quality's actions, which were expressly authorized or mandated by the deed of trust, may have violated the deed of trust's implied covenant of good faith and fair dealing.  It is well established the scope of the implied covenant of good faith and fair dealing in any contract cannot be interpreted so broadly as to prohibit a party from taking an action that is expressly authorized by the agreement.  (See *Carma Developers, supra,* 2 Cal.4th at p. 374.)  Accordingly, sustaining the demurrer without leave to amend as to Jenkins's claims against Quality was proper.

*b.  Jenkins cannot assert claims against Chase for WaMu's lending and loan servicing activities prior to WaMu's financial collapse.*

We now turn to the allegations relating to Chase.  Included amongst Jenkins's numerous claims against Chase for allegedly violating the implied covenant of

32

good faith and fair dealing is the claim Chase "[w]illfully placed [Jenkins] in a loan that she did not qualify for by inflating her income." Jenkins, however, acknowledges in both her SAC and opening brief she originated her loan with WaMu on March 23, 2007, more than one year before Chase acquired the defunct bank's assets from the FDIC. Furthermore, the terms of the Purchase and Assumption Agreement executed by Chase and the FDIC on September 25, 2008, specifically states that Chase's acquisition of WaMu's assets did not include the assumption of "*any liability*" associated with the defunct bank's lending and loan servicing activities prior to its financial collapse. As there is no dispute as to the authenticity of the Purchase and Assumption Agreement found in the record, it is obvious Jenkins cannot pursue a claim against Chase for WaMu's alleged inflation of her income when she applied for her loan prior to March 23, 2007. Thus, sustaining the demurrer without leave to amend as to this allegation was proper.

### c. *Jenkins cannot base her claim on alleged statutory violations.*

Jenkins also asserts Chase breached the implied covenant of good faith and fair dealing by violating the provisions of three statutes. Jenkins's SAC asserts Chase breached the implied covenant by violating the provisions of two federal statutes (15 U.S.C. § 1601 and RESPA). And in her opening brief, Jenkins asserts for the first time Chase breached the implied covenant by violating section 2923.5.

Even if we assume Jenkins's SAC pled sufficient facts to pursue these statutory claims, Jenkins's broader assertion these alleged statutory violations provide a proper basis for her breach of contract claim is without merit. As a necessary prerequisite for a contract claim asserting a breach of the implied covenant of good faith and fair dealing, a plaintiff must relate the alleged breach to the express terms or underlying purposes of an identified contract. (See *Carma Developers*, *supra*, 2 Cal.4th at pp. 371-374.) The California Supreme Court noted in *Carma Developers,* that a contract action to enforce the implied covenant cannot be brought "to protect some general public

33

policy interest not directly tied to the contract's purpose." (*Id.* at p. 373.) Jenkins cannot assert statutory violations, which provide independent grounds for possible claims, under the rubric of a breach of contract claim, especially when she makes no effort to link the actions that allegedly violated the statutes to the express terms or underlying purposes of a specific contract between the parties. Jenkins's fourth cause of action fails to make any attempt to allege these purported statutory violations somehow deprived her of the benefits she was due under a contract. Accordingly, sustaining the demurrer without leave to amend as to the claims relating to these alleged statutory violations was proper.

### d. *Jenkins fails to plead facts to assert a claim against Chase.*

In addition to the allegations discussed immediately above, Jenkins's fourth cause of action asserts Chase breached the implied covenant of good faith and fair dealing by committing a multitude of wrongful acts. We summarized all these alleged acts at the outset of our present discussion, so we will not repeat them again here. As with her breach of contract claim against Quality, Jenkins fails to unambiguously assert a contract in which the implied covenant was breached by Chase. However, for the purposes of our analysis, we interpret Jenkins's SAC as asserting Chase violated the implied covenants found in the deed of trust and promissory note she executed in 2007.

As we noted above, because the purpose of the implied covenant of good faith and fair dealing is limited to assuring the parties' compliance with the contract at issue, the scope of conduct prohibited by the implied covenant is confined by the "purposes and express terms" of the agreement. (*Carma Developers*, *supra*, 2 Cal.4th at p. 373.) Consequently, an action alleging a breach of the implied covenant cannot be used by a plaintiff to try to extend existing, or to create new, obligations that were not contemplated by the parties when the contract was executed. (*Ibid.*) In light of this fundamental principal of contract law, a plaintiff raising a claim for the breach of the implied covenant must allege a reasonable relationship between the defendant's allegedly wrongful conduct and the express terms or underlying purposes of the contract. (*Ibid.*)

34

Jenkins's fourth cause of action simply asserts Chase breached the implied covenants of the deed of trust and promissory note, and then lists conclusory and vague allegations of wrongful conduct by Chase. Nowhere in her SAC or opening brief does Jenkins identify an express term or underlying purpose of the two contracts that was breached or frustrated by Chase's alleged actions, and she fails to assert any actions Chase failed to perform that were reasonably contemplated by the terms of the contract in order to accomplish the agreement's purposes. For these reasons, Jenkins fourth cause of action fails to satisfy the fundamental prerequisite for a claim asserting a breach of the implied covenant of good faith and fair dealing—a specific allegation Chase's actions did something to interfere with her right to receive the benefits of the agreement.

Furthermore, at the outset of her fourth cause of action, Jenkins makes a broad assertion Chase was "under a *contractual* duty as the loan servicer to attempt to reach a workout plan to allow [Jenkins] to avoid the foreclosure." However, she again fails to point to any provision in the promissory note or deed of trust in which such a duty is expressly set forth or from which we can reasonably infer such a contractual duty exists. For all of the foregoing reasons, we conclude sustaining the demurrer as to Jenkins's fourth cause of action was proper.

*e. Jenkins cannot cure the defects in her fourth cause of action.*

We now consider whether Jenkins has shown there is a reasonable possibility she could cure the defects we have identified in her fourth cause of action by way of an amendment. (*Herrera*, *supra*, 205 Cal.App.4th at p. 1501.) Notably, Jenkins's opening brief fails to state how she could amend her fourth cause of action to cure the defects identified by the court. So we review the record to determine if a curative amendment is "'both apparent and consistent with the plaintiff's theory of the case.' [Citation.]" (*Ibid.*)

As we discussed in great detail above, Jenkins's fourth cause of action suffers from four distinct flaws. The first three flaws we have identified cannot be cured

35

by way of an amendment because, as we noted in our prior discussions of each of these flaws, they are incurable errors that cannot be repaired or reconstructed. Jenkins cannot assert a breach of contract claim against Quality because Quality's actions, including its initiation of nonjudicial foreclosure proceedings, were either expressly authorized or permitted by the deed of trust. It would not be possible for Jenkins to allege permissible or authorized actions somehow prohibited her from receiving the benefits of the agreement. Jenkins also cannot assert a breach of contract claim against Chase for the lending or loan servicing activities of WaMu prior to Chase's acquisition of the defunct bank's assets. The Purchase and Assumption Agreement executed by Chase and the FDIC in September 2008 expressly states that Chase did not assume any liability for WaMu's lending and loan servicing activities prior to its collapse. Moreover, Jenkins cannot assert a breach of contract claim against Chase for its alleged violations of three statutes—15 U.S.C. section 1601, 12 U.S.C. section 2601, and section 2923.5. These statutes provide independent grounds for any claims resulting from their violation, and Jenkins cannot use a breach of contract claim to pursue a statutory claim that is not related to the contract at issue. For these reasons, Jenkins cannot amend her fourth cause of action to cure these defects.

To determine whether Jenkins may cure the fourth flaw—that she failed to plead facts to state a valid claim against Chase—we must review the express terms and underlying purposes of the deed of trust and promissory note. To cure this defect, Jenkins would have to amend her SAC to identify an express term or underlying purpose that was breached or frustrated by Chase's alleged wrongful actions. Alternatively, Jenkins would have to amend her SAC to allege a specific action Chase failed to perform that resulted in an impermissible interference with her right to receive a benefit under the contract.

Our own review of the promissory note and deed of trust, which Jenkins attached to her SAC as exhibits A and B, fails to identify any express terms that were

36

violated by the purported wrongful acts Jenkins's alleges Chase committed. Furthermore, the underlying purposes of the promissory note and deed of trust are (1) that Jenkins shall be able to use the loaned funds on the terms and at the interest rate specified in the promissory note, and (2) that Chase shall have the security provided by the deed of trust. (See *Milstein v. Security Pac. Nat. Bank* (1972) 27 Cal.App.3d 482, 487.) The undisputed facts indicate Jenkins was provided with the benefits of the promissory note and Chase's actions in pursuit of its secured interest are expressly authorized by the deed of trust. Accordingly, we concluded the court properly sustained the demurrer without leave to amend to Jenkins's fourth cause of action.

   7. *Fifth Cause of Action—Violations of RESPA*

   Jenkins's fifth cause of action alleges Chase violated RESPA by: (1) failing to timely acknowledge receipt of the QWR she sent Chase on November 29, 2010; (2) failing to completely respond to the QWR; (3) failing to investigate or explain why the information requested in the QWR would not be provided; and (4) providing information to consumer reporting agencies regarding Jenkins's delinquent loan payments.[3] As a result of Chase's alleged noncompliance with RESPA, Jenkins fourth cause of action alleges she "has suffered actual damages, including but not limited to devastation of her credit, monetary damages, and emotional distress related to the threatened foreclosure of her [H]ome." Furthermore, in her opposition to Chase's demurrer, Jenkins attempted to describe her actual damages in more detail by stating she has suffered "late fees and reduction in credit rating resulting from Defendants' reporting delinquency on her account; the extensive amount of time [she] has spent attempting to

---

[3]         Jenkins's SAC specifically states she is raising the RESPA claim only against Chase. However, in her opposition to the Defendants' demurrer and her opening brief to this court, Jenkins seems to suggest she is also raising this claim against Quality. As her SAC specifically raises the claim against Chase and contains no facts that would suggest she is raising this claim against Quality, we assume Jenkins's later reference to Quality as to this cause of action was in error.

37

resolve this matter, including communications with Chase and litigation; extreme and continued frustration attempting to obtain information from her servicer so that she can seek a loan modification; and constant worrying about the loss of her [H]ome."

Jenkins also contends Chase has engaged in a "broader pattern and practice of failing to comply with RESPA" by not responding to qualified written requests. As support for this contention, Jenkins points to Chase's failure to respond to her QWR. For the harm she has purportedly suffered due to this "pattern and practice," Jenkins asserts she "is entitled to statutory damages in the amount of $2,000 per violation."

RESPA regulates the settlement process for real estate disputes (*Hardy v. Regions Mortg., Inc.* (11th Cir. 2006) 449 F.3d 1357, 1359), as well as banks' servicing of mortgage loans regulated by the federal government (*MorEquity, Inc. v. Naeem* (N.D.Ill. 2000) 118 F.Supp.2d 885, 900). Any mortgage loans secured by a first or subordinate lien on residential real property are regulated by the federal government. (12 U.S.C. § 2602(1)(A).)

Section 2605 of RESPA sets forth requirements for the servicing of mortgage loans. Among other things, this section requires a loan servicer to respond to a QWR for information from the borrower. (12 U.S.C. § 2605(e)(1).) RESPA defines a QWR as a written correspondence that "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and [¶] (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." (12 U.S.C. § 2605(e)(1)(B).) The loan servicer must provide the borrower with a "written response acknowledging receipt of the correspondence within 20 days." (12 U.S.C. § 2605(e)(1)(A).) Also, "[n]ot later than 60 days . . . after the receipt from any borrower of any qualified written request," the loan servicer is required to correct the borrower's account, provide the borrower with the requested information relating to the

servicing of the loan, or provide the borrower with an explanation as to why the requested information is unavailable. (12 U.S.C. § 2605(e)(2).)

During the 60-day period after the borrower has transmitted his or her QWR, RESPA expressly shields the borrower from unfavorable reports being sent to a consumer reporting agency. The relevant provision states as follows: "During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency . . . ." (12 U.S.C. § 2605(e)(3).)

Importantly, RESPA empowers borrowers to pursue damage remedies in the event a loan servicer fails to comply with RESPA's provisions. (12 U.S.C. § 2605(f).) An individual borrower asserting a RESPA claim may recover "any *actual damages* to the borrower as a result of the failure" and "any additional damages, as the court may allow, in the case of a *pattern or practice of noncompliance* with the requirements of [RESPA], in an amount not to exceed $1,000." (12 U.S.C. § 2605(f)(1), italics added.) Also, the statutes authorize an individual borrower to recover the costs, including attorneys fees, incurred in connection with a successful action under the statute. (12 U.S.C. § 2605(f)(3).)

*a. Jenkins fails to plead facts to show the alleged RESPA violation resulted in actual damages.*

Asserting a defendant's failure to respond to a QWR and the suffering of general damages is insufficient to state a claim under RESPA. (*Sullivan v. JP Morgan Chase Bank, N.A.* (E.D.Cal. 2010) 725 F.Supp.2d 1087, 1095.) Instead, federal courts have read 12 U.S.C. section 2605 as requiring a plaintiff to plead specific facts showing both the defendant's failure to respond and the plaintiff's suffering of "pecuniary

39

damages" in order to avoid the dismissal of his or her RESPA claim. (*Allen v. United Fin. Mortg. Corp.* (N.D.Cal. 2009) 660 F.Supp.2d 1089, 1097 (*Allen*); *Hutchinson v. Delaware Sav. Bank FSB* (D.N.J. 2006) 410 F.Supp.2d 374, 383 (*Hutchinson*).) In effect, this pleading requirement has limited RESPA claims to circumstances in which a plaintiff can allege specific facts to show causation—"'actual damages to the borrower as a result of the failure [to comply with RESPA requirements].'" (*Lal v. Am. Home Servicing, Inc.* (E.D.Cal. 2010) 680 F.Supp.2d 1218, 1223 (*Lal*).)

Federal district courts have found sufficiently pled actual damages include the assertion of concrete harms caused by the RESPA violation itself, not harms generally resulting from a plaintiff's default and the foreclosure of his or her home. For example, in *Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D.Cal. Mar. 19, 2012, No. 3:11–CV–2091–JM–WVG) 2012 WL 928433, plaintiff alleged a loan servicer refused to honor a loan modification plan adopted by the previous servicer, failed to correctly credit plaintiff's mortgage payments, incorrectly calculated interest, and failed to "provide a substantive response" to plaintiff's QWR request attempting to verify the debt owed pursuant to the new loan modification plan. The district court held that, given the uncertainty over how much plaintiff actually owed under those circumstances, defendant's failure to adequately respond to plaintiff's qualified written request conceivably caused harm. (*Id* at p. *6.)

Similarly, in *Hutchinson, supra,* 410 F.Supp.2d at pages 382-383, plaintiffs' complaint alleged actual damages under RESPA by asserting defendants continued to report late payments to credit bureaus and failed to respond to plaintiffs' multiple qualified written requests, even after the debt at issue had been discharged in bankruptcy. Thus, the district court found it was plausible defendants' RESPA violations caused damage to plaintiffs' credit and precluded them from obtaining other loans. (*Ibid.*; see also *Yulaeva v. Greenpoint Mortg. Funding, Inc.* (E.D.Cal. Sept. 3, 2009, No. CIV. S-09-1504 LKK/KJM) 2009 WL 2880393, at *15 [finding plaintiff adequately

40

plead damages where she alleged she was made to pay referral fee that was prohibited by RESPA].)

Unlike the plaintiffs in the above cases, Jenkins's fifth cause of action does not allege facts to show a harm that specifically derived from Chase's failure to respond to the QWR. Instead, the harms Jenkins alleges—"devastation of her credit," "emotional distress related to the threatened foreclosure of her [h]ome," "late fees," and time spent attempting to avoid foreclosure—result from her admitted default on her loan and/or her attempts to dispute the validity of the promissory note and the security interest created by the deed of trust. (See *Allen, supra,* 660 F.Supp.2d at p. 1097 [dismissing RESPA claim where plaintiff had "not actually attempted to show that the alleged RESPA violations caused any kind of pecuniary loss (indeed, his loss of property appears to have been caused by his default)"].)

Indeed, Jenkins cannot assert these harms were the result of Chase's failure to respond to the QWR because she admits she sent the QWR months after her default and the receipt of the notice of default. Because Jenkins concedes she sent the QWR following her default, the facts asserted in Jenkins's fifth cause of action fail to show her claimed damages for fees, negative credit reports, and emotional distress were plausibly incurred because of the alleged RESPA violation, and were not the consequences of her earlier default. (See *Obot v. Wells Fargo Bank, N.A.* (N.D.Cal. Nov. 2, 2011, No. C11–00566 HRL) 2011 WL 5243773, at p. *3 [dismissing RESPA claim because the undisputed facts indicated QWR was sent following plaintiff's default, so plaintiff could not show facts indicating the alleged damages were not incurred because of the default].) Therefore, we find Jenkins's fifth cause of action is deficient because she fails to allege actual damages with respect to Chase's alleged RESPA violation.

41

*b. Jenkins fails to plead facts to show a pattern or practice of noncompliance.*

Jenkins's separate contention that Chase's failure to respond to the QWR she sent on November 29, 2010, on its own sets forth sufficient facts to state a RESPA claim under the statute's "'a pattern or practice of noncompliance'" prong is without merit. (See *Garcia v. Wachovia Mortg. Corp.* (C.D.Cal. 2009) 676 F.Supp.2d 895, 909 (*Garcia*).) "[A]lmost as a matter of definition, a single failure to respond to a Qualified Written Request does not state a claim for a 'pattern or practice' of doing so." (*Ibid.*) Thus, we find Jenkins's fifth cause of action is also flawed because she fails to allege facts to support her contention of a pattern or practice of noncompliance with the provisions of RESPA. Accordingly, the sustainment of Defendant's demurrer to Jenkins's fifth cause of action was proper.

*c. Jenkins cannot cure the defects in her fifth cause of action with an amendment.*

We now consider whether there is a reasonable possibility the defects in Jenkins's fifth cause of action may be cured by an amendment. (See *Herrera, supra,* 205 Cal.App.4th at p. 1501.) As we have noted above, Jenkins has the burden of proving the reasonable possibility of such a curative amendment. (*Ibid.*)

In her opening brief, Jenkins asserts she can amend the second defect in her fifth cause of action by "further document[ing] the pattern of non-compliance by setting forth the efforts she made to obtain information." Jenkins, however, fails to address the first shortcomings in her fifth cause of action—her failure to allege actual damages she has incurred because of Chase's failure to respond to the QWR.

Moreover, to cure her failure to allege a pattern or practice of noncompliance, Jenkins would have to amend her SAC to allege multiple instances in which Chase failed to respond to QWRs. (See *Garcia*, *supra*, 676 F.Supp.2d at p. 909.) As Jenkins's proposed amendment fails to set forth facts she could add to her complaint

42

to show Chase failed to respond to *numerous* QWRs she sent the bank, we conclude her proposed amendment would not cure this defect in her fifth cause of action.

Furthermore, to cure her failure to allege actual damages resulting from Chase's failure to respond to the QWRs, Jenkins's would have to allege facts that show a direct link between her alleged harms and Chase's violation of the statute.  (See *Allen*, *supra,* 660 F.Supp.2d at p. 1097; *Lal, supra,* 680 F.Supp.2d at p. 1223.)  Jenkins's failure to address this shortcoming in her opening brief limits our review of this issue to the facts she has already set forth in her SAC, and we do not identify a potentially curative amendment that would be consistent with her theory of the case.  Accordingly, we conclude the court did not abuse its discretion by sustaining Chase's demurrer as to Jenkins's fifth cause of action without leave to amend.

*B.  The Court did not Abuse its Discretion by Denying Jenkins the Opportunity to Amend her SAC.*

On appeal, Jenkins argues that, even if the claims in her SAC were insufficiently plead, the court abused its discretion by denying her leave to amend her SAC to clarify her claims.  Furthermore, Jenkins's opening brief broadly asserts her SAC sets forth facts to support separate causes of action for promissory estoppel, injunctive relief, and violations of 15 U.S.C. section 1641(g).

A court's sustaining a demurrer without leave to amend is appropriate when, based on ""'"the nature of the [complaint's] defects and [the plaintiff's] previous unsuccessful attempts to plead,"'"" it is improbable the plaintiff can state a cause of action.  (*Krawitz v. Rusch* (1989) 209 Cal.App.3d 957, 967.)  We analyzed and discussed whether it was possible for Jenkins to cure the flaws in her SAC with curative amendments as we proceeded through our analysis of her various claims.  As to each claim, Jenkins failed to provide the court with any reason to believe she could cure the defects in her SAC by way of an amendment.  Furthermore, Jenkins makes no attempt to

43

explain how the facts in her SAC support new causes of action for promissory estoppel, injunctive relief, and violations of 15 U.S.C. section 1641(g). "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

Although she has filed three complaints and has been provided with the opportunity to explain how she could cure the flaws in her SAC on appeal, Jenkins has yet to articulate a cause of action against Defendants. "Leave to amend should be denied where the facts are not in dispute and the nature of the claim is clear, but no liability exists under substantive law." (*Lawrence v. Bank of America* (1985) 163 Cal.App.3d 431, 436.) "The demurrer was therefore properly sustained without leave to amend." (*Smith, supra,* 225 Cal.App.3d at p. 55.)

C. *We Need Not Decide the Tender Issue.*

Jenkins also challenges the court's alternative ground of lack of tender for sustaining Defendants' demurrers. As we uphold the court's ruling on the ground Jenkins's SAC fails to state a cause of action, we need not and do not consider whether Jenkins's SAC fails on the alternative ground that she has not pled she is prepared to tender the amount owing on the note. (See *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 578 [plaintiff must offer to pay full amount of outstanding debt when raising an action to set aside trustee's sale for irregularities in notice or procedure of the sale].)

D. *The Court Did Not Improperly Take Judicial Notice of the Validity of the Recorded Notice of Default and Substitution of Trustee.*

Finally, Jenkins contends the court erred by taking judicial notice of the validity of the recorded notice of default and substitution of trustee. Although she concedes it was permissible for the court to take judicial notice of the existence of the

recorded documents, she argues the court overstepped its discretion by assuming the truth and validity of the two documents.

Jenkins attempts to support her contention by directing our attention to a statement made by the court during the demurrer hearing on September 27, 2011. Jenkins contends the court's reference to the dates the notice of default and substitution of trustee were recorded, as well as the court's misuse of the phrase "'recorded assignment of interest,'" somehow evidences the court's purported adoption of the validity of the documents. Furthermore, Jenkins contends the court necessarily relied upon its alleged impermissible adoption of the validity of the documents when it decided to sustain Defendants' demurrers to her SAC without leave to amend because "[t]he court provided no other reasoning in its order to contradict [her] allegation that [Defendants] do not have a valid interest in [her] loan."

"'Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is relevant to an issue in the action without requiring formal proof of the matter.' [Citation.]" (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.) Evidence Code section 452, subdivision (h), authorizes a court to take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." When a court decides to exercises its discretion under Evidence Code section 452 with regards to a recorded document, the court may only take judicial notice of "[f]acts and propositions" within the document, not the document as a whole. (Evid. Code, § 452, subd. (h).)

When a court is required to rule on a demurrer, the discretion provided by Evidence Code section 452 allows the court to take judicial notice of a fact or proposition within a recorded document "'that cannot reasonably be controverted, even if it negates an express allegation of the pleading.' [Citation.]" (*Fontenot v. Wells Fargo Bank, N.A.*

45

(2011) 198 Cal.App.4th 256, 264 (*Fontenot*).) "[T]he propriety of the court's action depends upon the nature of the facts of which the court takes notice from the document." (*Id*. at p. 265.) We review the court's purported decision to take judicial notice of the notice of default and substitution of trustee for abuse of discretion. (*Id*. at p. 264.)

Jenkins's contentions are without merit for several reasons. First, the record does not indicate the court took judicial notice of the recorded notice of default and substitution of trustee. Jenkins attached seven exhibits to her SAC, including the notice of default, substitution of trustee, and notice of trustee's sale as exhibits C, D, and E. Quality also requested the court take judicial notice of four recorded documents, including the notice of default, substitution of trustee, and notice of trustee's sale, in support of its demurrer to Jenkins's SAC. The court, however, never ruled on Quality's request for judicial notice, nor did the court issue an order during the proceedings that indicated it was taking judicial notice of any recorded documents. Furthermore, before a court may take judicial notice of a fact or proposition pursuant to Evidence Code section 452, the court "shall afford each party reasonable opportunity . . . to present to the court information relevant to (1) the propriety of taking judicial notice of the matter and (2) the tenor of the matter to be noticed." (Evid. Code, § 455, subd. (a).) Nothing in the record suggests the court afforded the parties an opportunity to argue the merits of whether it should take judicial notice of the recorded documents. In the absence of both a court order taking judicial notice of the recorded documents and a hearing in which the parties argued the merits of Quality's request, we find no reason to believe the court took judicial notice of the recorded documents. Consequently, Jenkins's contention the court abused its discretion under Evidence Code section 452 by taking judicial notice of the recorded documents is without merit.

Second, even if we assume the court's statement during the demurrer hearing indicates the court took judicial notice of the recorded documents, the hearing transcript does not indicate the court overstepped its discretion under Evidence Code

46

section 452. As we noted above, a court may take judicial notice of numerous facts that can be deduced from recorded documents, including, among other things, their existence, recordation, and date of recordation, without overstepping the court's discretion under Evidence Code section 452. (*Fontenot, supra,* 198 Cal.App.4th at pp. 264-265.)

For example, the court in *Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1117-1118, held a trial court, when ruling on a demurrer, may take judicial notice of the parties, dates, and legal significance of recorded documents relating to a real estate transaction. The *Poseidon* court was careful to distinguish the taking of judicial notice as to the obvious legal significance of recorded documents' terms, a permissible action under Evidence Code section 452, from the taking of judicial notice of the truth and validity of multiple factual representations within the recorded documents, which would be impermissible under the statute. (*Ibid.*)

Likewise, in *McElroy v. Chase Manhattan Mortgage Corp.* (2005) 134 Cal.App.4th 388 (*McElroy*), the appellate court affirmed the trial court's decision to take judicial notice of the recording of a notice of default, the date the notice was recorded, and the amount the notice stated was owed to show plaintiffs had proper notice of the total outstanding debt and their option to cure the default. (*Id.* at pp. 394-395.)

In the present case, the court simply stated it had reviewed the dates the notice of default, substitution of trustee, and notice of trustee's sale were recorded by referencing the exhibits attached to Jenkins's SAC. Importantly, there is no dispute between the parties as to whether the three documents were actually recorded on these dates. Furthermore, when the court's statement is read in its proper context, it is clear the court referred to the dates these documents were recorded, as well as the fact the foreclosure sale had yet to occur, in order to explain to Jenkins's attorney that, even if Quality believed it was acting as trustee when it executed and recorded the notice of

47

default prior to Chase's substitution of Quality as the new trustee,[4] Jenkins could not show this technical irregularity somehow caused sufficient prejudice to allow her to bring an action to impede the nonjudicial foreclosure of her home. In no way was the court referring to the existence or nonexistence of Chase's beneficial interest in the promissory note and deed of trust. The record of the demurrer hearing makes clear the court, unlike Jenkins's attorney, understood the statutory scheme for nonjudicial foreclosure only allows a plaintiff to halt the foreclosure process if (1) a plaintiff can show the defendant has failed to comply with the statute's operative provisions and (2) the defendant's noncompliance somehow prejudiced the plaintiff. In this light, it is clear the court was simply trying to explain to Jenkins's attorney the facts alleged in Jenkins's SAC were insufficient to allow her to pursue a cause of action to forestall the nonjudicial foreclosure of her home.

Moreover, reading the record of the demurrer hearing in its correct context reveals the court mistakenly used the phrase "recorded assignment of interest" when it intended to refer to the recorded substitution of trustee. This misstatement was not a legally significant error. Jenkins cannot use the court's unintentional mislabeling of the recorded substitution of trustee during the demurrer hearing as sufficient support for her contention the court was using judicial notice to determine the validity of the recorded documents.

Lastly, Jenkins is mistaken to contend the court necessarily relied upon the validity of the recorded documents when it decided to sustain Defendants' demurrers to her SAC without leave to amend. As we discussed at length during our analysis of Jenkins's first cause of action, the court did not need to decide against her contention Chase did not have a beneficial interest in the promissory note and deed of trust to sustain

---

[4] As we discussed above during our review of the first cause of action in Jenkins's SAC, Quality, in fact, executed and recorded the notice of default "as agent for beneficiary," not as the trustee under the deed of trust.

48

Defendants' demurrers and deny her leave to amend.  Jenkins's lack of standing to bring a preemptive action under the statutory scheme setting forth nonjudicial foreclosure, as well as her inability to plead an actual controversy existed between herself and Defendants, independent of the validity of her contention as to whether Chase possessed a beneficial interest in the loan, was sufficient grounds for the court to sustain Defendants' demurrers without leave to amend.  For all the reasons stated above, we find the court did not abuse its discretion under Evidence Code section 452.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


THOMPSON, J.