Filed 4/21/16  Highbarger v. Pentagon Federal Credit Union CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID HIGHBARGER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PENTAGON FEDERAL CREDIT UNION et al., <br><br> Defendants and Respondents. | A142404 <br><br> (Alameda County <br> Super. Ct. No. HG12642986) |

Plaintiffs David and Mayumi Highbarger appeal from the judgment dismissing their third amended complaint, a judgment entered after the trial court sustained general demurrers by defendants Pentagon Federal Credit Union (PenFed) and PNC Bank (PNC) without granting further leave to amend.  Plaintiffs contend that all of the ten causes of action they alleged are sufficient to survive the demurrers.  We conclude otherwise, but with the proviso that plaintiffs should be afforded a second, and quite possibly final, opportunity to file another amended pleading demonstrating in detail why the respective statutes of limitation for each of their causes of action was tolled by reason of the delayed discovery of the harm they allegedly suffered.  Thus, we reverse the judgment of dismissal.

## BACKGROUND

### The First Complaint and Demurrers

Plaintiffs filed their initial complaint in August 2012 with causes of action styled: (1) Unjust Enrichment; (2) Violation of RESPA (Real Estate Settlement and Procedures

1

Act enacted by Congress in 1974 [12 U.S.C. § 2601 et seq.]); (3) Fraud and Concealment; (4) Declaratory and Injunctive Relief; (5) Intentional Infliction of Emotional Distress; (6) Negligence; (7) Breach of the Duty of Good Faith and Fair Dealing; and (8) Violation of Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.). The complaint named PenFed and PNC, each of which filed a general demurrer. However, no ruling was made on either demurrer because plaintiffs filed an amended complaint.[1]

### The First Amended Complaint and Demurrers

Plaintiffs filed their first amended complaint in January 2013. In addition to the same eight causes of action in their original complaint, plaintiffs alleged the following: (9) Constructive Fraud; (10) Violation of California Civil Code section 2923.5; (11) Unfair Debt Collection Practices under state and federal law; (12) Fraudulent Nondisclosure in violation of Civil Code sections 1709 and 1710; and (13) Loss of Credit Expectancy. The factual underpinnings of the pleading may be summarized as follows:

Plaintiffs have owned a home in Pleasanton since 1998. Plaintiffs' first refinancing in 2003 was with National City Bank, which was acquired by PNC in 2008. The "mortgage lending business" so acquired is now handled by PNC Mortgage, a PNC subsidiary. Plaintiffs refinanced again in 2004, this time with PenFed, and the following year undertook a new obligation with PenFed. Specifically, plaintiffs alleged that PNC

---

[1] " 'When [a party] amended his complaint . . . he in effect admitted that the demurrer was good and that his complaint was insufficient . . . .' [Citation.]" (*Anmaco, Inc. v. Bohlken* (1993) 13 Cal.App.4th 891, 900.) This is the basis for principle of appellate practice that " 'an amend[ed] pleading supersedes the original one, which ceases to perform any function . . . . [Citations.]' 'Such amended pleading supplants all prior complaints. It alone will be considered by the reviewing court. [Citations.]' [Citation.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 884.) Just as the filing of plaintiffs' amended complaint mooted any defects or issues concerning their original complaint, it likewise made academic any faults in defendants' demurrers to that initial pleading. We therefore do not address the arguments in plaintiffs' brief purporting to persuade that the "trial court didn't recognize and address an invalid demurrer to the Original Complaint." We do note that the asserted defects are not substantive and could not in any way impact the validity of plaintiffs' final pleading, their third amended complaint.

"considers itself as holder of a claim pursuant to a loan agreement incurred around 2004 ('First Agreement')." PenFed "considers itself as holder of a claim pursuant to a loan agreement dated August 30, 2004 ('Second Agreement')", and also "as holder of a claim pursuant to a HELOC [Home Equity Line Of Credit] agreement incurred in July 2005 ('Third Agreement')." PNC was the "servicer" of the First Agreement, and PenFed provided plaintiffs "a credit card which was established and maintained independent of the Second and Third Agreement[s]."

"In Summer 2004, Plaintiff [Mr. Highbarger[2]] contacted a representative at PenFed about obtaining a loan. The PenFed representative offered to help Plaintiff find the best loan for them, including 'shopping it around' with competitors to get the best rate and terms. The PenFed representative said based on current rates and terms, a 15-year fixed loan by PenFed would offer Plaintiff the best deal. . . . PenFed . . . assured Plaintiff he could afford the loan. Based on these assurances, Plaintiff, along with his wife, signed the Second Agreement.

_____

[2] Up to this point, Mr. Highbarger was the sole plaintiff. However, in the same ruling sustaining PenFed's general demurrer, the trial court stated: "[W]ith regard to Defendant's argument that Plaintiff's failure to join his wife as an indispensable party is SUSTAINED WITH LEAVE TO AMEND. Under the current circumstances, the court finds that complete relief cannot be accorded among those already parties in the absence of Mayumi Highbarger. Thus, the disposition of the action may still subject Defendant to risk of incurring double, multiple, or otherwise inconsistent obligations. Plaintiff has leave to amend to add his wife as a Plaintiff in this action or explain the reason(s) why she is not a necessary party or face dismissal of causes of action on which she is deemed as an indispensable party pursuant to CCP 389." Ms. Highbarger was thereafter added as a plaintiff in the second and third amended complaints. For purposes of simplicity, Ms. Highbarger has been treated as a plaintiff from the beginning of this litigation, and henceforth quoted references to "he"—meaning Mr. Highbarger—are understood to include both.

Plaintiffs argue that Ms. Highbarger was not served with PenFed's demurrer to the second amended complaint, and that their objection to this omission was "ignored" by the trial court in ruling on the demurrer. But no such argument is made with respect to the third amended complaint. As already shown (see fn. 1, ante), it is the third amended complaint, and the demurrers thereto, that are dispositive for this appeal. The claimed omission is not germane to the issue of whether the third amended complaint states a claim to relief.

"In Summer 2005, Plaintiff again contacted a PenFed representative about obtaining another loan. The PenFed representative once again offered to help Plaintiff find the best loan for him, including determining if other lenders had better rates or terms. The PenFed representative suggested a Home Equity Line of Credit (HELOC) offered by PenFed provided both the best rate and terms compared to other lenders. Plaintiff then asked the PenFed representative to proceed with . . . an application for a PenFed loan, and to also lock in the rate. Plaintiff called up approximately two days later to confirm the loan was submitted to PenFed by the PenFed representative, and to confirm the locked in rate. Plaintiff was informed that they submitted the paperwork to PenFed, but that the rate wasn't locked in since they felt the rates would go down. However, the rates went up. Plaintiff then asked them to lock in the rate at the new, current and higher rate to avoid it going up any further. Further, PenFed representative offered to submit Plaintiff for the maximum amount possible—$197,200.00 based on [the] home appraisal . . . Plaintiff was led to believe he could afford this amount and based upon this representation by the PenFed representative, agreed to apply for this amount."

In the summer of 2011, plaintiffs encountered financial difficulties. The Highbargers "reached out to PenFed," which "suggested he apply for a loan modification, which he did." PenFed responded: "The documentation provided indicates that you have the capacity to repay the original terms of the loan(s) that you presently have with [PenFed]." PenFed also stated: "Please note all lines of credit have been closed." (Italics omitted.) "Both the credit card and credit line . . . associated with the Third Agreement were cancelled without prior notification . . . in response to Plaintiff filing a request for a loan modification in July 2011." By the time plaintiffs filed for bankruptcy protection in February 2012, 60% of their income went to "monthly mortgage debt . . . . With these debt-to-income ratios alone, Plaintiff would have easily qualified for a loan modification if he were properly considered as PenFed promised." "At the time of the filing for bankruptcy, Plaintiff was either fully current on [their] loans or only 2-3 weeks late [their] payments."

About the time they were discharged from bankruptcy in June 2012, plaintiffs "made numerous attempts to contact PenFed to once again discuss a loan modification, however, PenFed refused to discuss any loan modification . . . ."

Plaintiffs alleged that "PenFed breached a contract with Plaintiff by charging a higher interest rate but refused to provide the corresponding services which the higher interest rate was intended to pay." PenFed's failure to respond to plaintiffs' requests for information and modification of their obligations not only violated the RESPA, but also invalidated "the purported power of sale contained in the First Agreement . . . ." Numerous and material misstatements and omissions made by PenFed and PNC amounted to fraud, constructive fraud, and the intentional infliction of emotional distress. Omissions by PenFed and PNC amounted to negligence. All of this made a violation of the covenant of good faith and fair dealing causing "loss of credit expectancy." And a claimed violation of the Unfair Competition Law (UCL), Civil Code sections 2923.5, 1709–1710, 1788.2 et seq., and 15 U.S.C. section 1692 et seq. In addition to general and exemplary damages, plaintiffs prayed for declaratory and injunctive relief.

Again, both defendants demurred. Following an unreported hearing, the trial court sustained both demurrers with a detailed order, the pertinent language of which reads:

"The Demurrer in its entirety is SUSTAINED WITH LEAVE TO AMEND to state facts sufficient to constitute a cognizable cause of action against this Defendant. In amending, Plaintiff shall take note of the arguments asserted by Defendant in their demurrer as to the purported substantive flaws in their fraud causes of action, and Plaintiff shall have a good faith basis in fact and law for asserting this cause of action against Defendant in an amended complaint. (See C.C.P. § 128.7(b).)

"Specifically, to the extent fraud-related causes of action are alleged (see for example the 17200 claim), fraud claims must be pled with the required particularity. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 676, p. 778; Lazar v. Superior Court (1996) 12 Cal.4th 631, 645 ['This particularity requirement necessitates pleading facts which "show how, when, where, to whom, and by what means the representations

5

were tendered" ']; Medallion v. Clorox Co. (1996) 44 Cal.App.4th 1807, 1818 ['Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal connection with the reliance on the representations must be shown.']; Tarmann v. State Farm Mut. Auto. Ins. Co. (1991) 2 Cal.App.4th 153, 157-158 ['The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.'])

"Most importantly, Plaintiff shall allege facts in support of (a) any cognizable cause(s) of action which is not barred by the applicable statute of limitations, or (b) any cognizable cause(s) of action and reasons why the applicable statute of limitations do not apply thereto. Specifically, Plaintiff shall allege facts as opposed to conclusion[s] to show that the applicable statute of limitations was effectively tolled or does not apply.

"Plaintiff shall entitle the new complaint as the 'Second Amended Complaint' and make sure that they are filing a complete document that conforms to California Rule of Court 2.111. Moreover, Plaintiff is restricted to amending the complaint in the manner specified here. In other words, Plaintiff is not granted leave to amend to allege a completely new set of facts or causes of action not raised in the original complaint. Specifically, as to the claims that Defendant argues are invalid in California or are otherwise barred based on the arguments asserted[.] Plaintiff shall amend the cause of action to either state a valid claim or delete it from the second amended complaint. Plaintiff is also free to delete and/or take away as many allegations as deemed necessary."

**The Second Amended Complaint and Demurrers**

Plaintiffs' first amended complaint had 36 pages; their second had 51. Again, a number of supposed defects were identified by PenFed and PNC in their demurrers. Following another unreported hearing, the trial court sustained each demurrer with a detailed order that was virtually identical to the ones filed in connection with plaintiffs' first amended complaint.

6

**The Third Amended Complaint and Demurrers**

Plaintiffs' third amended complaint had 52 pages, one more than their second amended complaint.

Following an unreported hearing, the trial court sustained each demurrer "in its entirety" because "After several opportunities to amend, plaintiffs still fail to allege sufficient facts to state a timely and cognizable claim against this defendant."[3] Judgment was entered dismissing plaintiffs' complaint "in its entirety." The trial court dissolved the preliminary injunction halting a foreclosure sale of plaintiffs' home, and declined plaintiffs' request for a stay.

**REVIEW**

**Introduction to Our Analysis**

It is appropriate to begin with comments delineating some features of what follows.

First, the record before us does not show that a foreclosure occurred prior to entry of the judgment we are to review. Indeed, the record shows rather conclusively that a forced sale did not occur, and, by reason of the injunction, was never an imminent possibility. Therefore, the threat of such a sale is not relevant to our analysis.

Second, plaintiffs continue to act to represent themselves. Their in propria persona status brings them no special privileges. "A lay person . . . who exercises the privilege of trying his own case must expect and receive the same treatment as if represented by an attorney—no different, no better, no worse." (*Taylor v. Bell* (1971) 21 Cal.App.3d 1002, 1009.) Plaintiffs are " ' "restricted to the same rules of evidence and procedure as is required of those qualified to practice law before our courts." ' " (*City of Los Angeles v. Glair* (2007) 153 Cal.App.4th 813, 819.) "[T]he rules of civil

---

[3] Read in its entirety, and when considered with the two prior orders, this order leaves no doubt the trial court was ruling that the general demurrers were being sustained as to each and every cause of action alleged by plaintiffs. Plaintiffs' claim to the contrary is simply wrong.

7

procedure must apply equally to parties represented by counsel and those who forgo attorney representation." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984–985.)

Third, "[b]ecause this case comes to us on a demurrer for failure to state a cause of action, we accept as true the well-pleaded allegations in plaintiffs' first amended complaint. ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' [Citation.] ' "[A] complaint otherwise good on its face is subject to demurrer when facts judicially noticed render it defective." [Citation.]' [Citations.]"[4] (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.)

We now proceed to an examination of those causes of action plaintiffs have elected to contest on this appeal, in the order plaintiffs present them in their opening brief.

## Fraud[5]

" ' "The elements of fraud . . . are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity . . . ; (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Small v. Fritz Companies, Inc*. (2003) 30 Cal.4th 167, 173.) More specifically, "[t]he required elements for fraudulent concealment are: (1) concealment or suppression of a material fact; (2) by

---

[4] PNC devotes several references in its brief to the role of judicial notice. But the trial court was only asked to take judicial notice of one document—a relief from stay order of the bankruptcy court—submitted by PenFed in connection with its demurrer to plaintiffs' first amended complaint, and there is nothing in the record before us indicating that PenFed's request was granted. PNC also points out that our review could include any exhibits attached to a complaint, and both PNC and PenFed obliquely fault plaintiffs for not attaching various writings and documents referred to in the third amended complaint. But plaintiffs were under no obligation to do so. (See 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 427, p. 562.)

[5] This includes plaintiffs' third cause of action ("Fraud and Concealment"), the seventh ("Constructive Fraud"), and the tenth ("Fraudulent Nondisclosure-Violations of Section 1709 and 1710 of the California Civil Code").

a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 606.)

The statute of limitation for fraud is three years, measured from "the discovery, by the aggrieved party, of the facts constituting the fraud . . . ." (Code Civ. Proc., § 338, subd. (d)), subject to this qualification: "the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99.)

The gist of plaintiffs' allegations are that since they bought their residence in 1998, they have refinanced three times. The first time was in 2003, with National City Bank, which was acquired by PNC in 2008. The second time was in 2004, with PenFed, and the third was in 2005, when plaintiffs made the line of credit agreement with PenFed. Both of these loans were concluded after "the PenFed representative assured Plaintiffs they could . . . afford the loan." Plaintiffs have also had a credit card since 1996 that was provided by PenFed.

According to plaintiffs: "In Summer 2011, Plaintiffs found themselves increasingly struggling to come up with the money to make the needed payments, both for their mortgages as well as the credit cards. Plaintiffs tried various means to address this negative cash flow," without success. They asked PenFed for a "loan modification," which was denied. Apparently at the same time, "[p]laintiffs' credit card and credit line . . . were cancelled by PenFed without prior notification." When plaintiffs were driven to seek bankruptcy protection in February 2012, plaintiffs were "either fully current on their loans or only 2-3 weeks late on the payments."

9

While still in bankruptcy, plaintiffs "made numerous attempts to contact PenFed to discuss a loan modification." These attempts were unsuccessful until "[i]n or about April 2012, Mr. David N. LeGrande, a 'Bankruptcy Specialist', for PenFed, contacted Plaintiffs. Plaintiffs and Mr. LeGrande spoke on the phone and communicated via email. Plaintiffs expressed concern that another loan modification request to PenFed would not be performed with any reasonable due diligence. Plaintiffs noted that they are were [*sic*] in better financial condition due to the credit card debt being discharged in by [*sic*] the bankruptcy Court, yet due to large amount of mortgage debt, Plaintiffs' financial condition didn't significantly improve. Mr. LeGrande acknowledged Plaintiffs' concern and said he'd get back to Plaintiffs on that concern and requested a property appraisal be conducted. PenFed did not discuss, ask, or perform any appraisal in response to Plaintiffs' 2011 request for a loan modification. Soon thereafter, LeGrande responded, stating that the Plaintiff had to submit another loan modification request, and that the request would receive proper due diligence. LeGrande again requested that a property appraisal be completed, but he refused to further discuss Plaintiffs concern that a loan modification would be done with proper due diligence."

Plaintiffs alleged that PenFed, acting through "Sam Feldman," made four misrepresentations and omissions "[i]mmediately prior to Plaintiffs entering into the Second Agreement on or about August 2004," "Plaintiffs . . . were ignorant of Sam Feldman's representations and omissions and believed them to be true. In reliance upon these representations and omissions, Plaintiffs took certain actions, including but not limited to, signing the Second Agreement. Had Plaintiffs known the actual facts, they would not have taken such action. Plaintiffs' reliance on the Sam Feldman's representations were justified and Plaintiffs sustained damages."

Plaintiffs alleged that PenFed employee "Cheryl Brand" made four misrepresentations and omissions "[i]mmediately prior to Plaintiffs entering into the Third Agreement in or about June 2005." Plaintiffs believed these representations and omissions to be true, and, in justifiable reliance thereon, "took certain actions, including but not limited to, signing the Third Agreement."

10

Essentially the same allegations were made concerning what PenFed employee Gina Tejral said or did not say in connection with plaintiffs' "June 2011 Loan Modification Request."

The following paragraph is the fulcrum of this appeal:

"Plaintiffs have filed the cause of action within the applicable statute of limitations pursuant to the delayed discovery rule, as Plaintiff had no knowledge, nor should they have, of the wrongdoing of PenFed, the effects of said conduct, and/or that said conduct was the cause of their injuries as alleged herein, until within the applicable statute of limitations for the filing of this cause of action. Based on the delayed discovery rule, Plaintiffs' failure to discover their cause of action against PenFed, prior to this time is reasonable and justifiable and not a result of Plaintiffs' failure to investigate or to act. Specifically, when Plaintiffs obtained their loans in 2004 and 2005, PenFed agents represented that they were professionals, that they had evaluated Plaintiffs qualifications, and Plaintiffs were able to afford the loans. At all relevant times neither Plaintiff was an expert or professional in the lending and/or mortgage field. Neither Plaintiff had the knowledge or professional ability to analyze and determine whether a loan was affordable to them. As such, Plaintiff accepted and did not question the representations of PenFed's agents. Further, Plaintiffs did not significantly utilize the HELOC agreement of 2005 until the Summer of 2010, as such there was never any indication that they could not afford the loans until after 2010. Plaintiffs did not suspect that PenFed had allowed them to enter a loan agreement that they could not afford until the Spring 2011 when they started to experience severe financial distress."

Concerning PNC and the "First Agreement," plaintiffs alleged that "[i]n and around February 2003 Galen Leeks," "an underwriter for National City Mortgage," had a telephone conversation with plaintiffs. During the course of that conversation, Leeks "told Plaintiffs via the telephone as well as in loan documentation . . . that the market rate given Plaintiffs' financial condition was 7.875%." Through Leeks, PNC "failed to disclose the [unspecified but higher] true market rate and closing costs for Plaintiff's loans" they eventually secured from National City Mortgage. Leeks's representations

11

were false.  "PNC continues to engage in this concealment by refusing to respond to qualified written requests, in violation of RESPA."  Again, plaintiffs alleged that they justifiably replied upon Leeks's misrepresentations.

"In or around May 2012," PNC employee Jennifer Key "failed to inform Plaintiffs they were eligible to apply for modification of their PNC loans.  Plaintiffs didn't apply for a loan modification, to their detriment.  As a result, Plaintiffs incurred damages associated with continuing with a loan above the appropriate market rate, accrual of interest rates, late fees and other costs."  With respect to PNC, plaintiffs reiterated their allegations concerning the delayed discovery of their cause of action.

In their seventh cause of action for "Constructive Fraud," plaintiffs essentially repeated the allegations concerning PenFed employees Feldman, Brand, and Tejral and their part in the plaintiffs' entering into the "Second Agreement," the "Third Agreement," and the "June 2011 Loan Modification Request."  Plaintiffs also realleged the claims against PNC employees Leeks and Kay concerning the "First Agreement" and the May 2012 solicitation to plaintiffs "to apply for modification of their PNC loans."  Plaintiffs once again reiterated their allegations concerning the delayed discovery of their cause of action.

Plaintiffs' tenth cause of action (styled, "Fraudulent Nondisclosure—Violations of Section 1709 and 1710 of the California Civil Code") against PenFed alone, was a reframing of the same allegations concerning Feldman, Brand, and Tejral.  It too had the delayed discovery allegations.

**Breach of Contract**

"A cause of action for breach of contract requires pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach and damage to plaintiff resulting therefrom.  [Citation.]  A written contract may be pleaded either by its terms—set out verbatim in the complaint or a copy of the contract attached to the complaint and incorporated therein by reference—or by its legal effect.  [Citation.]  In order to plead a contract by its legal effect, plaintiff must 'allege the substance of its relevant terms.  This is more difficult, for it requires a careful analysis of the instrument,

comprehensiveness in statement, and avoidance of legal conclusions.' [Citation.]" (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1489.) The applicable statute of limitations for "[a]n action upon any contract, obligation or liability founded upon an instrument in writing" is four years. (Code Civ. Proc., § 337, subd. (1).) When fraud and contract are linked, this period does not commence until the fraud is discovered. (*Souza & McCue Const. Co. v. Superior Court* (1962) 57 Cal.2d 508, 511.)

Plaintiffs alleged this cause of action only as to PenFed based on their credit card account. They alleged that "[o]n or about December 1996, PenFed issued Plaintiffs a credit [card] with their lowest interest with no incentives or rewards. [¶] . . . In or about December 1998, PenFed, pursuant to a written 'AGREEMENT' assigned to Plaintiffs a new premium credit card that replaced the credit card issued in 1996. . . . The terms of the AGREEMENT are as follows: [¶] (a) In return for paying a premium interest rate on unpaid balances, Plaintiffs would receive cash back on purchases. [¶] (b) In return for paying a premium interest rate on unpaid balances, Plaintiffs would also receive 'points' and other rewards associated with this higher interest rate. [¶] (c) Plaintiff may elect to switch to a credit card with a lower interest rate at any time, that is, one that offered none of the services associated with the premium interest rate. [¶] . . . [¶]

". . . PenFed has breached the AGREEMENT with Plaintiffs in one or more of the following respects, including but not limited to: [¶] (a) Charging a premium interest rate but refusing to allow Plaintiffs to receive cash back on purchases, through the unilateral canceling of the credit card. [¶] (b) Charging a premium interest rate but refusing to allow Plaintiffs to receive points and other rewards. [¶] (c) Refusing to allow Plaintiffs to switch to a lower interest rate, one that would correspond to the eliminated services associated with the premium interest rate."

"Plaintiffs have fully performed all the terms and conditions of the AGREEMENT with PenFed, except those which have been excused by reason of the multiple breaches of the contract by PenFed, including but not limited to being current on all payments at the time PenFed canceled the credit card."

13

**RESPA**

"RESPA regulates the settlement process for real estate disputes [citation], as well as banks' servicing of mortgage loans regulated by the federal government [citation]. Any mortgage loans secured by a first or subordinate lien on residential real property are regulated by the federal government. (12 U.S.C. § 2602(1)(A).) [¶] Section 2605, part of RESPA sets forth requirements for the servicing of mortgage loans. Among other things, this section requires a loan servicer to respond to a QWR [Qualified Written Request] for information from the borrower. (12 U.S.C. § 2605(e)(1).) RESPA defines a QWR as a written correspondence that '(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and [¶] (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.' (12 U.S.C. § 2605(e)(1)(B).) The loan servicer was required to provide the borrower with a 'written response acknowledging receipt of the correspondence within 20 days.' (12 U.S.C. former § 2605(e)(1)(A).) Also, '[n]ot later than 60 days . . . after the receipt from any borrower of any qualified written request,' the loan servicer was required to correct the borrower's account, provide the borrower with the requested information relating to the servicing of the loan, or provide the borrower with an explanation as to why the requested information was unavailable. (12 U.S.C. former § 2605(e)(2).)" (*Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 530–531; disapproved on another ground in *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919.)

"RESPA empowers borrowers to pursue damage remedies in the event a loan servicer fails to comply with RESPA's provisions. (12 U.S.C. § 2605(f).) An individual borrower asserting a RESPA claim may recover '[a]ny *actual damages* to the borrower as a result of the failure' and 'any additional damages, as the court may allow, in the case of a *pattern or practice of noncompliance* with the requirements of [RESPA], in an amount not to exceed $1,000.' (12 U.S.C. former § 2605(f)(1), italics added.) Also, the statutes authorize an individual borrower to recover the costs, including attorney fees, incurred in

connection with a successful action under the statute. (12 U.S.C. § 2605(f)(3).)" (*Jenkins v. JP Morgan Chase Bank, N.A.*, *supra*, 216 Cal.App.4th 497, 531.)

A cause of action for violation of RESPA's provisions must be brought within three years "from the date of the occurrence of the violation." (12 U.S.C. § 2614.) The date of the "occurrence" is ordinarily the date the transaction closed, that is, when the loan was completed (*Snow v. First American Title Ins. Co.* (5th Cir. 2003) 332 F.3d 356, 359; *Jensen v. Quality Loan Service Corp.* (E.D. Cal. 2010) 702 F.Supp.2d 1183, 1195), or the date the disclosures should have been made. (*Moore v. Mortgage Electronic Registration Systems* (D.N.H. 2012) 848 F.Supp.2d 107, 120.)

Plaintiffs alleged this cause of action only as to PNC because it is the loan servicer. As relevant here, they alleged on information and belief that "PNC engaged in a practice referred to as *yield spread premium* ('YSP')," and "falsified the interest rate on the terms for the loan, which did not reflect the market rate. As a direct consequence of PNC's actions, Plaintiffs were required to pay excessive interest rates."

"Starting in on or about March 2005, Plaintiffs began making biweekly payments instead of a single monthly payment on their note with PNC. PNC advertised and encouraged Plaintiff to take this action, as a means of reducing overall cost of the loan. Specifically, Plaintiffs were told by PNC that they would save on interest because half their monthly payment would be paid early. Plaintiffs contacted PNC in or about August 2005, and made an oral inquiry as to how much money that had saved with this method. PNC informed Plaintiffs that the funds paid early were not credited to their account until the second half of the payment was received [at/by] PNC.

". . . [O]n or about April 10, 2012 and on or about June 4, 2012 Plaintiffs sent PNC written requests that PNC provide the following information . . . : [¶] (a) Whether, and if charged, how much of a penalty was charged for having a homeowners policy with a high deductible [¶] (b) Whether PNC has placed their own forced home owner's policy on the house, and if so, total costs, fees and penalties . . . . [¶] (c) Whether any late fees were charged when Plaintiffs conducted split payments, and if so, how much was charged and when [¶] (d) Identification of all fees and penalties and there [*sic*]

15

cause. [¶] (e) The Current owner of the loan, including contact information, dates and authorized individuals [¶] (f) Who or what is the current legal owner of the mortgage? If it was PNC, to provide proof of the proper transfer of the mortgage to PNC? [¶] (g) Does PNC have the original paperwork that established and created the mortgage? [¶] (h) Provide copies of all written agreements that established the mortgage. [¶] (i) Provide a complete list of all owners of the mortgage, including the date of transfers or assignments of the debt. [¶] (j) Provide an accounting of all payments made against the debt and an accounting of all fees, charges, costs, legal fees, penalties, and interest charged because of the debt. [¶] (k) Provide a verification or copy of all legal papers filed against Plaintiffs. In each request Plaintiffs specifically stated that the request was a qualified written request under RESPA. PNC failed to respond to Plaintiffs' written requests and failed [to] provide the information . . . requested . . . . [¶] . . . [¶]

"PNC continues to refuse to provide an accounting of the money paid, as well as to disclose the interest rate for Plaintiffs' loans. By reason of PNC's actions, Plaintiffs suffered, and continue to suffer, substantial damages . . . including, but not limited to the fact that Plaintiffs continued to pay an excessive interest rate . . . ."

### Negligence

" 'Actionable negligence involves a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.' " (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill, LLP* (2014) 59 Cal.4th 568, 573.) Such an action ordinarily must be filed within two years of "the . . . neglect of another" (Code Civ. Proc., § 335.1), but this period does not start until the plaintiff discovered, or had reason to discover, the factual basis of the claim. (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806–807 (*Fox*).)

As against PenFed, plaintiffs alleged: "At all relevant times, PenFed, as a mortgage broker, owed Plaintiffs a fiduciary responsibility to ensure Plaintiffs could afford the loan with PenFed. [¶] . . . Plaintiffs were never in a position to afford the loan provided by PenFed. PenFed knew, or should have known that Plaintiffs could not afford the at issues loan. PenFed breached its duty to ensure Plaintiffs could afford this loan, as

16

recently as June 2011. [¶] . . . Defendant knew, or should have known, that their failure to exercise due care in the performance of the loan modification/servicing would result in the foreclosure process . . . . [¶] . . . Defendant breached the duty to Plaintiffs when they failed to provide the reasonable care required of them as a servicer by failing to conduct due diligence in Plaintiffs' loan modification request, and continued to breach this duty when Plaintiffs asked for assurances that his loan modification would be conducted with reasonable due diligence. [¶] . . . These breaches of duty caused Plaintiffs to take out loans they could not afford, causing Plaintiffs extreme financial distress, bankruptcy, humiliation, embarrassment, anxiety, and significant emotional distress."

As against PNC, plaintiffs alleged: "Pursuant to RESPA, at all relevant times PNC had a duty to exercise due care of the servicing of Plaintiffs' loan associated with the First Agreement. [¶] . . . Defendants breached this . . . duty under RESPA by ignoring Plaintiffs' repeated QWR and VOD[6] requests . . . . [¶] . . . Defendants had the duty of care and to be honest with Plaintiffs. PNC is in a position of authority and uneven bargaining power and was required to provide Plaintiffs with the necessary information that would allow Plaintiffs to make prudent and beneficial decisions regarding his loan modification or paying off his loan. PNC is aware that Plaintiffs were paying above the market rate, yet have refused to disclose per HUD requirements what the true market rate is. Further, by refusing to respond to QWR and VOD letters, they are ignoring their duty to provide Plaintiffs an accounting of their payments, which would clearly demonstrate the extent of damages they have caused Plaintiffs. [¶] . . . By reason of PNC's negligence, Plaintiffs have suffered, and continues to suffer, substantial damages. . . ."

**Violation of Civil Code section 2923.5**

Plaintiffs alleged against PenFed: "California Civil Code section 2923.5 holds that a mortgagee, trustee, beneficiary, or authorized agent may not file a notice of

_____

[6] This abbreviation is not explained in the third amended complaint.

17

default . . .until 30 days after initial contact is made or 30 days after satisfying the due diligence requirements."  The purpose of this statute "is for the authorized agent to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.  During the initial contact, the mortgagee, beneficiary, or authorized agent shall advise the borrower that he or she has the right to request a subsequent meeting and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days."  PenFed violated this statute in that it "failed to inform Plaintiffs they had the right to request a subsequent meeting," "failed to access Plaintiffs' financial situation in order to prevent foreclosure," and "failed to notify Plaintiffs of options to avoid foreclosure."

"In 2008, the Legislature enacted Civil Code section 2923.5 in response to the foreclosure crisis.  [Citation.]  It prohibits filing a notice of default until 30 days after the lender contacts the borrower 'to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure.'  (Civ. Code, § 2923.5, subds. (a)(1), (a)(2); . . . .) [7]  [¶]  However, Civil Code section 2923.5 does not provide for damages, or for setting aside a foreclosure sale, nor could it do so without running afoul of federal law, that is, the Home Owners Loan Act [citation], and implementing regulations [citation].  [Citations.]  The statute was 'carefully drafted to avoid bumping into federal law' regulating home loans.  [Citation.]  As a result, the *sole* available remedy is 'more time' before a foreclosure sale occurs.  [Citation.]  After the sale, the statute provides no relief.  [Citations.]  Further, the statute does not—and legally could not—require the lender to modify the loan.  [Citation.]"  (*Stebley v. Litton Loan Servicing, LLP*, *supra*, 202 Cal.App.4th at pp. 525–526.)

---

[7] "The statute applies to owner-occupied residences . . . that are secured by 'mortgages or deeds of trust recorded from January 1, 2003, to December 31, 2007.' (Civ. Code, § 2923.5, subd. (i).)"  (*Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 526, fn. 3.)

18

**Violation of the UCL**

Plaintiffs alleged that defendants' "conduct as alleged in [the] first, second, third, eighth, ninth and tenth causes of action [i.e., for breach of contract, violation of RESPA, fraud and concealment, violation of Civil Code section 2923.5, unfair debt collection practices, and fraudulent nondisclosure] as set forth above [*sic*] constitutes an unfair and unlawful business practice within the meaning of the California Business and Professions Code section 17200, et seq. Plaintiffs seek restitution and disgorgement from Defendants of all monies received." They also prayed for defendants to be enjoined "from committing such practices in the future." The UCL's statute of limitations is four years (Bus. & Prof. Code, § 17208), but this period may be tolled under the discovery rule (*Aryeh v. Canon Business Solutions, Inc*. (2013) 55 Cal.4th 1185, 1189, 1195–1196.)

**Declaratory and Injunctive Relief**

According to plaintiffs: "An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties. Plaintiffs maintain that the 'Notice of Default' executed by Defendant PenFed on July 23, 2013 and recorded with the Alameda County Recorder on July 25, 2013 is invalid, in that, the Defendant PenFed failed to meet the notification and good faith requirements for filing a Notice of Default. PenFed maintains that the July 23, 2013 'Notice of Default' satisfied the notification and good faith requirements for filing a Notice of Default, and is valid under California statute." Plaintiffs explicated a myriad of disadvantages that would befall them from defendants' actions "unless . . . restrained by order of this Court" from conducting a foreclosure sale.

It seems clear that the underpinning for this cause of action is PenFed's alleged noncompliance with Civil Code section 2923.5 and the Rosenthal Fair Debt Collection Practices Act, and PNC's noncompliance with RESPA. A cause of action for declaratory relief would adopt the different statutes of limitation for the underlying violations. (*Maguire v. Hibernia Savings & Loan. Soc*. (1944) 23 Cal.2d 719, 733–734.) In a like vein, there is no separate statute of limitation for seeking an injunction because that is merely a species of a remedy, not a substantive cause of action. (*Shamsian v. Atlantic*

19

*Richfield Co*. (2003) 107 Cal.App.4th 967, 984.) Both declaratory and injunctive relief are equitable remedies, and thus within the rule that "the running of an applicable statute of limitations will also bar equitable relief." (*Troeger v. Fink* (1958) 166 Cal.App.2d 22, 28; see also *id*. at p. 29 ["it is settled that where the statute of limitations has barred any right to 'coercive' relief, declaratory relief designed to vindicate the same asserted right is likewise barred"].)

### Unfair Debt Collection Practices

Plaintiffs alleged against PenFed that "On July 25, 2012, PenFed filed a SUBSTITUTION OF TRUSTEE, Instrument Number 2012237360, appointing QUALITY LOAN SERVICE CORPORATION (hereinafter 'QLSC') as the Trustee on PenFed's behalf. . . . [¶] . . . QLSC is a 'debt collector' engaging in 'debt collection' practices under the Rosenthal Fair Debt Collections Practices Act . . . ."

". . . PenFed, through its agent QLSC, violated the Rosenthal Act by using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of Plaintiffs' mortgage debt . . . . Specifically, Plaintiffs were told by a PenFed agent that they still owed a debt to PenFed despite all liability for any debt being removed by Plaintiffs' successfully discharged Chapter 7 bankruptcy.

". . . Despite PenFed receiving notification of the Plaintiffs' bankruptcy proceeding, Plaintiffs received letters on multiple occasions stating that QLSC was demanding payment and reimbursement on the debt. Their frequent letters . . . consistently stated in bolded capitals 'WE ARE ATTEMPTING TO COLLECT A DEBT, AND ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.' Such statements were included in mailings including a July 23, 2012, a full 4 months after Plaintiffs filed for bankruptcy and a full month after the bankruptcy court successfully discharged Plaintiffs' case on June 26, 2012." This conduct caused plaintiffs "damages and harm" in the form of "personal humiliation, embarrassment, mental anguish, anxiety, and emotional distress."

Actions for violation of the Rosenthal Act "may be brought . . . within one year from the date of the occurrence of the violation." (Civ. Code, § 1788.30, subd. (f).)

20

Although it cannot be ascertained with certainty, it seems likely that the issue of delayed discovery tolling various statutes of limitation arose in connection with the demurrers to plaintiffs' second amended complaint.

At first glance, and even making allowance for adversarial slant, there appears considerable force to how PenFed characterized the third amended complaint: "Plaintiffs' argument seems to be that they stuck their heads in the sand for six and seven years by borrowing money they had no idea if they could pay back, and made payments without regard to their financial condition. It is absurd to suggest that reasonable people acting diligently in determining their financial condition would be unable to determine that loans from six and seven years earlier, that they paid on time for that period of time without issue, would suddenly discover a fraud when their financial condition changed. Instead, the reasonable explanation is that the loans were affordable when made, but the change in plaintiffs' financial condition led to the inability to pay." Many of the statutes of limitation do indeed appear to have long elapsed. But that appearance cannot be accepted.

This action has not progressed beyond the pleading stage, when review is heavily slanted towards the pleader, at least insofar as factual allegations are judged. Allegations that may seem improbable on their face must be accepted as true. We do not concern ourselves with whether the plaintiffs can prove those allegations, only whether the third amended complaint "makes out a claim for some relief, even if . . . less than alleged." (*Caldera Pharmaceuticals, Inc. v. Regents of University of California* (2012) 205 Cal.App.4th 338, 350.) None of the relevant documents are properly before us (see fn. 4, *ante*), so plaintiffs' characterization of those instruments cannot be impeached at this time. And whether PenFed and PNC actually complied with the various statutes plaintiffs allege were violated presents questions of fact that cannot be resolved by demurrer. (See, e.g., *Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1058; *Skov v. U.S. Bank Nat. Assn.* (2012) 207 Cal.App.4th 690, 696–697.)

A major thrust of PNC's and PenFed's general demurrers to the third amended complaint is that all of plaintiffs' cause of actions were barred by the governing statutes

of limitation.  And plaintiffs are in error when they state in their brief that "it is questionable whether the Highbargers needed to address the statute of limitations at the demurrer stage . . . ."  " 'The defense of statute of limitations may be asserted by general demurrer if the complaint shows on its face that the statute bars the action.' [Citations.] There is an important qualification, however:  'In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows merely that the action may be barred.' [Citations.]  'The ultimate question for review is whether the complaint showed *on its face* that the action was barred by a statute of limitations, for only then may a general demurrer be sustained and a judgment of dismissal be entered thereon.' [Citation.]" (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1315–16.)

Plaintiffs should be under no illusion how close they come to failing this test.  By putting at issue their first refinancing more than a dozen years ago, plaintiffs test the limits of facial credulity.  But there is one legal doctrine that may help them—the doctrine of delayed discovery.

**Tolling**

Ordinarily, a period of limitations begins, or "accrues," at the time the obligation or liability arises regardless of the plaintiff's ignorance of the legal significance of known facts. (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 962; *Hogar Dulce Hogar v. Community Development Commission* (2003) 110 Cal.App.4th 1288, 1296–1297; *Naftzger v. American Numismatic Society* (1996) 42 Cal.App.4th 421, 428.)  However, under the delayed discovery rule, a claim does not accrue until the plaintiff discovers or through the exercise of reasonable diligence could have discovered the cause of his or her injury.  In *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397–398 (*Norgart*) our Supreme Court described the discovery rule thusly:  "[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof-when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong'

22

being used, not in any technical sense, but rather in accordance with its 'lay understanding' . . . ." (See also, e.g., *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110; *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 179.) *Norgart* further explained: "[Plaintiff] has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements. [Citation.] He has reason to suspect when he has ' " ' "notice or information of circumstances to put a reasonable person *on inquiry* " ' " ' [citation]; he need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place-he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does [citation]." (*Norgart v. Upjohn Co., supra,* at p. 398; *Jolly v. Eli Lilly & Co., supra,* at p. 1110.) In short, the limitations period under the discovery rule begins to run when plaintiff had information that would put a reasonable person on inquiry. (*Utility Audit Co., Inc. v. City of Los Angeles*, *supra*, 112 Cal.App.4th 950, 962; *Prudential Home Mortgage Co. v. Superior Court* (1998) 66 Cal.App.4th 1236, 1247; *Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 900.)

But delayed discovery allegations are subject to distinct pleading requirements. (*Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1068; *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1150; *Bradler v. Craig* (1969) 274 Cal.App.2d 466, 471.) In the classic formulation, "it is the complainant's burden to plead not merely the ultimate fact of reasonable delay in discovery, but specific facts which allow a legitimate inference that the delay was reasonable." (*Saliter v. Pierce Brothers Mortuaries* (1978) 81 Cal.App.3d 292, 299.) This can be almost as tough as alleging fraud: "In order to invoke this special defense to the statute of limitations, the plaintiff must specifically plead facts which show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." (*Id*. at p. 297; accord, e.g., *Camsi IV v. Hunter Technology Corp*. (1991) 230 Cal.App.3d 1525,

23

1536–1537; *Mangini v. Aerojet-General Corp.*, *supra*, 230 Cal.App.3d 1125, 1150; see *Barrington v. A.H. Robins Co.* (1985) 39 Cal.3d 146, 154 [citing *Saliter* for "plaintiff must specifically plead facts which show the time and manner of discovery and plaintiff's inability to have made an earlier discovery despite reasonable diligence"].)

And yet, in terms of actual living persons, the discovery rule is not as demanding as the pleading requirements for fraud. Explaining what it means by discovering, or having reason to, discover a cause of action, our Supreme Court explained: "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.] Under the discovery rule, suspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitation period [Citations.] *Norgart* explained that by discussing the discovery rule in terms of a plaintiff's suspicion of 'elements' of a cause of action, it was referring to the 'generic' elements of wrongdoing, causation, and harm. [Citation.] In so using the term 'elements,' we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them. [¶] The discovery rule . . . allows accrual [commencement] of the cause of action even if the plaintiff does not have reason to suspect the defendant's identity. . . . [¶] The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have ' " 'information of circumstances to put [them] *on inquiry*' " ' or they have ' " '*the opportunity to obtain knowledge* from sources open to [their] investigation.' " ' [Citations.] In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Fox*, *supra*, 35 Cal.4th 797, 807–808, fn. omitted; *Jolly v. Eli Lilly & Co.*, *supra*,

24

44 Cal.3d 1103, 1111 ["So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her"].)

The Supreme Court went on to reiterate the burden on the plaintiff seeking to come within the discovery rule: "In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence.' [Citation.] In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to 'show diligence'; 'conclusory allegations will not withstand demurrer.' [Citation.]

"Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light. In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." (*Fox*, *supra*, 35 Cal.4th 797, 808–809.)

*Fox* is not only relevant doctrinally, but also factually. In *Fox*, the issue of delayed discovery until the plaintiff's first amended complaint, in which she alleged "there was no way 'through which her reasonable diligence would have revealed, or through which she would have suspected the [defendant's product] as a cause of her injury.' " This was "insufficient to withstand demurrer because it failed to allege specific facts supporting the allegations," but the plaintiff was given a second chance to bring herself within the delayed discovery rule. (*Fox*, *supra*, 35 Cal.4th 797, 811.) We conclude plaintiffs also deserve a second chance on this issue, just as they were given a second chance at pleading fraud.

25

When a general demurrer is sustained without leave to amend, the reviewing court "decide[s] whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, . . . we reverse." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; see *Fox*, *supra*, 35 Cal.4th 797, 810 [" '[I]t is error for a . . . court to sustain a demurrer when the plaintiff has stated a cause of action *under any possible legal theory*' ", [italics added].) So it is here: plaintiffs have a *possible* legal theory that may permit them to escape the statutes of limitation arrayed against them. We are required to respect that possibility. Both PNC and PenFed point out in their respective briefs just how inadequate plaintiffs' first effort was. With this opinion, plaintiffs have now been advised how significantly much more detail than the nonspecific generalities alleged in the third amended complaint will be expected.[8]

## DISPOSITION

The judgment of dismissal is reversed. The parties shall bear their respective costs on appeal. Plaintiffs' request for statutory attorney fees is denied because they have not yet obtained any substantive relief. (See Civ. Code, § 2924.12, subd. (i); 12 U.S.C. § 2607(d).)

---

[8] PNC and PenFed are entirely at liberty to seek judicial notice of documents or materials which may assist in establishing that plaintiffs are not entitled to have one or more statutes of limitation tolled, or are relevant to other issues PenFed or PNC may submit are germane to resolving this action at the pleading stage.

26

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Miller, J.

A142404; *Highbarger v. Pentagon Federal Credit Union*